STATE of Wisconsin, Plaintiff-Respondent,

v.

Charles D. YOUNG, Defendant-Appellant.

Court of Appeals

*No. 97–0034–CR. Submitted on briefs June 6, 1997.—Decided July 17, 1997.*

(Also reported in 569 N.W.2d 84.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Susan E. Alesia* of the *Office of the State Public Defender*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Robert A. Selk*, assistant attorney general.

Before Eich, C.J., Dykman, P.J., and Vergeront, J.

VERGERONT, J. Charles Young appeals from a conviction for possession of THC in violation of § 161.41(3r), STATS. The sole issue on appeal is whether the initial stop by the police officer violated Young's right to be free from unreasonable searches and seizures. We conclude that it did and that the evidence the officer discovered as a result of the initial stop must be suppressed. We therefore reverse the conviction.

## BACKGROUND

The complaint charged Young with possession of THC as a repeater in violation of §§ 161.41(3r) and 161.48(3), STATS., and possession of drug paraphernalia in violation of § 161.573(1), STATS. The charges arose out of an incident in which Trooper Andrew Tennessen stopped Young as he was walking down the street and, after events that will be related in more detail below, seized marijuana and a pipe from Young. Young moved to suppress the evidence on the ground that the officer did not have reasonable suspicion to stop Young as required by *Terry v. Ohio*, 392 U.S. 1 (1968).[1] The trial court denied the motion, concluding there was reasonable suspicion. Young then pleaded guilty to possession of THC as a repeater and was fined $500 plus costs.

---

[1] The motion was brought under both the Fourth Amendment to the United States Constitution, which protects against unreasonable searches and seizures, and the state constitutional counterpart, Wisconsin Constitution, Article I, Section 11.

Trooper Tennessen and Young were the witnesses at the hearing on the suppression motion.[2] Trooper Tennessen testified that he had been a trooper with the Wisconsin State Patrol for seven-and-a-half years. On February 24, 1996, the date of the stop, he was assigned to the Dane County Narcotics and Gang Task Force. The Task Force had been his assignment for about a year, and he focused primarily on narcotics. His training consisted of a week long in-service on narcotics trafficking at the Wisconsin State Patrol Academy; a three day in-service with the Dane County Narcotics and Gang Task Force in early 1995; and a week long basic narcotics investigator school in December 1995.

At about 1:15 p.m. on February 24, 1996, Trooper Tennessen was involved in a surveillance operation with a number of other law enforcement personnel in an attempt to purchase narcotics in an area described as the Badger Road-Eric Circle-Fiedler Lane area in Madison. Trooper Tennessen knew this to be a high drug-trafficking area. A confidential informant and an undercover officer in an unmarked vehicle were driving through the area attempting to purchase crack cocaine. Trooper Tennessen's role, besides maintaining security and responding to emergencies, was to make contact with the person who sold the narcotics, try to identify them, and then release them.

Trooper Tennessen was contacted on his radio by Detective Gerfen, who was also part of the surveillance. Detective Gerfen told Trooper Tennessen that there was "a black male subject in the Badger Lane

---

[2] Young's testimony went primarily to the circumstances that occurred once Tennessen stopped him, most of which is not pertinent to the issue on appeal. Therefore, our summary of the relevant testimony is primarily that of Trooper Tennessen.

[sic] area that had just made short-term contact with another subject in that area." Detective Gerfen described the black male's build, height and clothing and stated he was heading westbound on Badger Road on the north side of the sidewalk.[3]

Trooper Tennessen drove eastbound on Badger Road for about a minute and a half until he saw a person who met the description and who Trooper Tennessen later identified as Young. Trooper Tennessen pulled his car up alongside Young, and he and his partner got out of the car and asked Young for identification. Young asked if there was a problem and Trooper Tennessen responded something to the effect of, "we saw you sell some drugs or buy some drugs" or that "a transaction took place." Young was cooperative, identified himself and, when Trooper Tennessen asked him if he had anything illegal on his person, Young responded that he had a marijuana pipe. Trooper Tennessen asked Young if he could search him for anything else illegal, and Young agreed. The trooper then did a pat down search and emptied Young's pockets. He found a small amount of marijuana and a marijuana pipe. There were other people in the area.

Trooper Tennessen acknowledged that he stopped Young based solely on what Detective Gerfen told him, not based on anything he personally observed. Detective Gerfen did not tell Trooper Tennessen that the person Young had contact with was a suspected drug

---

[3] Detective Gerfen also told Trooper Tennessen that the person was carrying a red cup. Young testified that when he was stopped he was taking a hair care product from the apartment of one sister to the apartment of another sister. Trooper Tennessen acknowledged that what Detective Gerfen described as a red cup could have been a hair products container. This is not pertinent to the issue on appeal.

dealer, and he did not tell Trooper Tennessen that Young was a suspected drug dealer. Because the meaning of "short-term contact" is important to this decision, we describe in detail Trooper Tennessen's testimony on the term. On direct examination he testified that, in high drug-trafficking neighborhoods, "short-term contact would be, in many time [sic], just to purchase drugs. An exchange of cash for drugs." He also testified on direct examination that in this area, drugs are sold right out on the street and that usually involves just a very short contact. On cross-examination, Tennessen testified as follows:

> Q. And Detective Gerfen had told you that this person had made a short-term contact, but you didn't know how long, and he didn't say if there was anything exchanged, correct?
> A. I don't recall specifically, okay.
> Q. So as far as you know, this contact was just two people meeting; they may not have even touched each other, as far as you know, right, and then left? That was the information that you got?
> A. Basically.
> Q. And when you—and based on that information [and the description Detective Gerfen provided] you stopped Mr. Young?
> A. Um-hum.

Trooper Tennessen testified on redirect that his understanding of "short-term contact" is the commonly accepted definition for the term within the Dane County Narcotics and Gang Task Force.

Young testified that he was in the neighborhood to visit his sisters, who lived there. He lived in another section of the city. He acknowledged talking to people outside his sisters' apartments while he was in the neighborhood.

The trial court concluded that Trooper Tennessen had reasonable suspicion to stop Young because of his understanding, based on his training and experience, that the term "short-term contact" could mean an exchange of money for drugs; because Young was in a high drug-trafficking area; and because Trooper Tennessen knew that Detective Gerfen was part of the surveillance operation looking for suspected drug activity. The trial court found that the area was primarily a residential area, and that Young's testimony that he was there to visit his sisters was plausible: since it was a residential area, people went there to visit "for entirely legitimate purposes." The court also noted the "inherent danger in simply stopping people because, through no fault of their own, they happen to be either living in or visiting a high drug-trafficking area." However, the court observed, the temporary and limited nature of the detention, in addition to the requirement of reasonable suspicion, are safeguards for those innocent people who are stopped.

## ANALYSIS

A brief investigatory stop is a seizure and is therefore subject to the requirement of the Fourth Amendment to the United States Constitution that all searches and seizures be reasonable. *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968). To execute a valid investigatory stop consistent with the Fourth Amendment, a law enforcement officer must reasonably suspect, in light of his or her experience, that some kind of criminal activity has taken or is taking place. *State v. Richardson,* 156 Wis. 2d 128, 139, 456 N.W.2d 830, 834 (1990). The officer must be able to point to specific and articulable facts that, taken together with rational inferences from

those facts, reasonably warrant the intrusion. *Terry*, 392 U.S. at 21. The standard is the same under Article I, Section 11 of the Wisconsin Constitution. *State v. Harris*, 206 Wis. 2d 242, 258, 557 N.W.2d 245, 252 (1996). The question of what constitutes reasonable suspicion is a common sense test: under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience. *State v. Jackson*, 147 Wis. 2d 824, 834, 434 N.W.2d 386, 390 (1989). An officer may rely on information received from another officer in making a stop. *See Johnson v. State*, 75 Wis. 2d 344, 349–50, 249 N.W.2d 593, 596 (1977). The inquiry in such a situation is whether the collective information among the officers is adequate to sustain the stop. *Id.* at 350, 249 N.W.2d at 596.[4]

In reviewing a denial of a motion to suppress, we will uphold the circuit court's findings of fact unless they are clearly erroneous. Whether those facts satisfy the constitutional requirement of reasonableness is a question of law, which we review de novo. *See State v. Waldner*, 206 Wis. 2d 51, 54, 556 N.W.2d 681, 683 (1996).

Young argues that observation of a brief contact between two individuals walking on a sidewalk in a residential neighborhood in the afternoon is insufficient to constitute a reasonable suspicion that a drug transaction has taken place, even in a neighborhood known for drug trafficking, and even if the officers

---

[4] Since Detective Gerfen did not testify, and since Trooper Tennessen testified that he himself observed nothing suspicious, we must determine whether Trooper Tennessen had reasonable suspicion based on his testimony of what he was told by Detective Gerfen and how he understood what he was told.

involved are trained in drug enforcement and surveillance. Young acknowledges that Trooper Tennessen could rely on information he received from Detective Gerfen based on Gerfen's observations. The critical point in Young's argument is that Detective Gerfen did not convey to Trooper Tennessen that he observed the exchange of any object or even the physical touching of the two individuals. The State's response is that there is reasonable suspicion because Trooper Tennessen received reliable testimony from Detective Gerfen that Young had just engaged in a short-term contact, and members of the task force "understood this to mean that a possible drug transaction had occurred."

Both parties appear to agree that there are no disputed facts, and that is what the trial court stated in its decision.[5] Although each party emphasizes differ-

[5] The court began its oral decision on the issue of reasonable suspicion by stating that the facts were without controversy. In listing the factors that constituted reasonable suspicion, the court noted that "Trooper Tennessen indicated short-term contact to him meant an exchange of cash for drugs." The court later stated that it was reasonable for Trooper Tennessen, based on his training and experience, to assume that Detective Gerfen's definition of "short-term contact" was the same as his, "that is, an exchange of cash for drugs. Specifically, they're looking for individuals who have a very brief contact with one another, may or may not touch one another, etcetera, then go about their business." The court noted that there can be legitimate reasons for that happening, "such as say[ing] hello to someone, whether you know them or not, to briefly pass the time of day with them." However, the court concluded that because of the testimony that this was a high drug area and the specific observation by the detective that this was a short-term contact, Trooper Tennessen had a reasonable suspicion when he stopped Young that Young had committed a crime involving drug trafficking.

ent portions of Trooper Tennessen's testimony on how he interpreted "short-term contact," we do not understand there to be a dispute over how he interpreted the term but rather over the legal consequences of his interpretation. Specifically, we do not understand the State to argue that Trooper Tennessen understood that Detective Gerfen had actually observed an exchange of drugs for cash, or the exchange of anything between Young and the other individual. Rather, we understand the State to argue that, because of the officers'

When defense counsel sought a clarification as to whether the court was finding that the term "short-term contact" meant different types of contact to Trooper Tennessen, the court responded that its notes indicated that Trooper Tennessen had testified, when asked what he meant by short-term contact, "an exchange of cash for drugs," and the court did not believe that he indicated another definition. When defense counsel referred to Trooper Tennessen's testimony on cross-examination that it could mean other things, the court responded that defense counsel might be correct in that regard, that the court's notes indicate that defense counsel "started off [his] cross-exam with very specific questions, which certainly narrow down the extent of the information that he had available." However, the court did not further discuss or clarify its findings regarding Trooper Tennessen's understanding of the term "short-term contract."

We do not read the court's decision as finding that Trooper Tennessen understood that Detective Gerfen had seen an exchange of cash for drugs. We read the court's decision as acknowledging that the term "short-term" contact as understood by Trooper Tennessen did not necessarily mean that Detective Gerfen had observed the exchange of cash for drugs, or the exchange of any object. We understand the court's determination to be that, because of the officers' training and experience in how drug transactions in that area took place, a brief contact between two individuals, even without the observation of the exchange of anything, could be a drug transaction, and that is sufficient to constitute reasonable suspicion.

training and experience of how drug transactions occur in this high drug-trafficking area, the observation of a brief meeting between the two individuals, without observing more, creates a reasonable suspicion that a drug transaction is occurring. The narrow issue presented for resolution, then, is whether this is sufficient to constitute a reasonable suspicion.

Both parties agree that Young's presence in an area known for drug trafficking is a permissible factor to take into account, along with other factors, in determining whether there was reasonable suspicion for the stop. *See State v. Morgan*, 197 Wis. 2d 200, 211, 539 N.W.2d 887, 892 (1995). They also agree that this factor, standing alone, does not provide the reasonable suspicion required for a lawful stop. This was established in *Brown v. Texas*, 443 U.S. 47 (1979), which we discuss in some detail as it provides a useful starting point for our analysis.

In *Brown*, two officers were cruising in a patrol car early one afternoon in an area of El Paso, Texas, which had a high incidence of drug traffic. The officers observed the defendant and another man, who were a few feet apart when they were first observed, walk away from one another in opposite directions in an alley. One of the officers testified that the two men had been together or were about to meet until the patrol car appeared. The officer got out of the patrol car and asked the defendant to identify himself and explain what he was doing. When the defendant refused to identify himself, he was arrested for violation of a Texas statute that makes it a criminal act for a person not to give his name and address to an officer who has lawfully stopped him and requested the information. *Id.* at 48–49. The officer testified that he stopped the

defendant because he looked suspicious and the officers had never seen him in that area before. *Id.*

In concluding that the stop was unlawful because the officers did not have a reasonable suspicion that the defendant was involved in criminal conduct the Court stated:

> Officer Venegas testified at appellant's trial that the situation in the alley "looked suspicious" but he was unable to point to any facts supporting that conclusion. There is no indication in the record that it was unusual for people to be in the alley. The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal activity. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood.

*Id.* at 52. In a footnote, the Court stated: "This situation is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer. [Citations omitted.]" *Id.* at 52 n.2.

The State argues that this case is distinguishable from *Brown* because, in addition to Young's presence in a high drug-trafficking neighborhood, Young was observed making a short-term contact with another individual, which, to a trained officer, "raised an articulable suspicion that a drug transaction may have occurred." We agree with the State that this additional factor was not present in *Brown*. However, we do not accept the premise implicit in the State's position that, because a trained officer testifies that certain conduct may mean that a drug transaction has occurred, it

automatically follows that the constitutional standard of reasonable suspicion has been met.

As the court in *Brown* pointed out, training and experience enables law enforcement officers to perceive and articulate meaning that would not arouse suspicion to an untrained observer. *Id.* The training and experience of the officers involved in an investigative stop is therefore one factor in the totality of the circumstances that courts take into account in deciding whether there is reasonable suspicion to make the stop. "But the fact that an officer is experienced does not require a court to accept all of his suspicions as reasonable, nor does mere experience mean that an [officer's] perceptions are justified by the *objective* facts. The 'basis of the police action must be such that it can be reviewed judicially by an objective standard.' [Citations omitted.]" *United States v. Buenaventura-Ariza*, 615 F.2d 29, 36 (2nd Cir. 1980).

Apart from Young's presence in a high drug-trafficking area, the only conduct that Trooper Tennessen knew Young had engaged in was having a "short-term contact" with another individual. He did not know if Young had exchanged any item with the individual or touched the individual, because, according to his testimony, "short-term contact" does not necessarily mean that that has taken place, and Detective Gerfen did not tell him that it did in this instance. We observe that stopping briefly on the street when meeting another person is an ordinary, everyday occurrence during daytime hours in a residential neighborhood. There is nothing in the record to suggest that that is not the case in this residential neighborhood, or in high drug-trafficking residential neighborhoods in general. The conduct that Trooper Tennessen considered suspicious, then, is conduct that large numbers of innocent citizens

engage in every day for wholly innocent purposes, even in residential neighborhoods where drug trafficking occurs. The trial court correctly acknowledged this. We give full weight to the training and experience of Trooper Tennessen and Detective Gerfen and to the knowledge they acquired thereby that in this neighborhood drug transactions occur on the street and involve very short contacts between individuals. However, we cannot agree with the trial court that this is sufficient to give rise to a reasonable suspicion that two individuals who meet briefly on the sidewalk in this neighborhood in the daytime are engaging in a drug transaction.

We recognize, as the State emphasizes, that conduct which has innocent explanations may also give rise to a reasonable suspicion of criminal activity. *Waldner*, 206 Wis. 2d at 51, 556 N.W.2d at 685. If a reasonable inference of unlawful conduct can be objectively discerned, the officers may temporarily detain the individual to investigate, notwithstanding the existence of innocent inference which could be drawn. *Id.* But the inference of unlawful conduct must be a reasonable one. *See Terry*, 392 U.S. at 21. It is also true that a series of acts, each of which are innocent in themselves may, taken together, give rise to a reasonable suspicion of criminal conduct. *See United States v. Sokolow*, 490 U.S. 1, 9–10 (1989). However, here we do not have a series of acts by Young but only one act which describes the conduct of large numbers of law-abiding citizens in a residential neighborhood, even in a residential neighborhood that has a high incidence of drug trafficking.

The State has not directed us to any case that finds reasonable suspicion on so spare a record. Our research disclosed cases that find reasonable suspicion where

the circumstances surrounding the meeting of two individuals in a high drug trafficking neighborhood are unusual, *see United States v. Trullo*, 809 F.2d 108, 112 (1st Cir. 1987) (late at night defendant is observed in a car stopped at curb; another individual gets in car for approximately twenty seconds; defendant drives a short distance and lets passenger out; passenger walks back toward where he was initially picked up); where there is a connection to someone identified as selling drugs with other specific conduct suggesting a drug transaction, *see, e.g., United States v. Garrett*, 959 F.2d. 1005, 1007 (D.C. Cir. 1992) (defendant went up to car that had been identified as selling narcotics in neighborhood and was observed obtaining small object from someone in car in exchange for cash); and where individual in high drug-trafficking area is observed exchanging objects or appearing to look at object in another's hand, together with evasive action once he spots police. *See, e.g., United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *Wilson v. Indiana*, 670 N.E.2d 27 (Ind. Ct. App. 1996); *People v. Batista*, 210 A. D.2d 59 (N.Y. App. Div. 1994).

On the other hand, courts have found no reasonable suspicion where the following factors were present in addition to location in a high drug-trafficking area. An officer observed an individual leaning into a car talking to the defendant who was in the driver's seat and testified that based on his experience this behavior often indicated a drug transaction was taking place. *Childs v. State*, 671 So. 2d 781, 782 (Ala. Ct. App. 1995). The defendant was observed getting into a car in broad daylight with an individual known to have past drug convictions; the two were observed huddling and talking with their hands close together but officers did not observe anything in their hands; their car drove off

431

in a normal manner. *United States v. Sprinkle*, 106 F.3d 613, 616 (4th Cir. 1997). There was an uncorroborated anonymous tip that a person meeting a certain description was selling drugs on a particular corner where it was known that drugs were sold to passing motorists; immediately after, the defendant, who met that description, was observed standing on that corner and then walking over to a parked car and leaning in as if to speak to the occupants. *United States v. Roberson*, 90 F.3d 75 (3rd Cir. 1996).

Because the determination of reasonable suspicion is fact sensitive and the possible factors vary, we do not look to other cases with the expectation that one will be factually identical and resolve the issue in this case. We are also aware that none of the cases we referred to are binding on this court. Nevertheless, cases from other jurisdictions are a persuasive indicator that the particularized information required for reasonable suspicion is not present in this case.

Although the "drug profile" cases are factually distinct from this case, we find them instructive as well. In such cases, police officers rely on a composite of acts or characteristics that, when considered separately are innocent, but, when considered together compose a "profile" common to drug traffickers in the officer's view. *See, e.g., Sokolow*, 490 U.S. at 10. Although the officer making an investigative stop in such a case testifies that the acts and characteristics observed fit a profile for a drug dealer, the court must nevertheless independently examine those factors to determine whether they constitute a reasonable suspicion that the individual detained is engaged in drug trafficking. *See id.; see also Reid v. Georgia*, 448 U.S. 438, 440–41 (1980). If the acts and characteristics relied on for the stop are not the particular conduct of the individual

stopped and describe large numbers of presumably innocent travelers, courts have found an absence of reasonable suspicion. *See, e.g., Reid*, 448 U.S. at 441; *United States v. Rodriguez*, 976 F.2d. 592, 595–96 (9th Cir. 1992); *United States v. Tapia*, 912 F.2d 1367, 1370–71 (11th Cir. 1990); *Derricott v. Maryland*, 611 A.2d 592, 596–98 (Md. App. 1992).

While the drug profile cases typically rely on a greater number of factors than are present in this case, we consider the reasoning to be applicable here. The factors giving rise to suspicion here are: (1) presence in a high drug-trafficking area; (2) a brief meeting with another individual on a sidewalk in the early afternoon; and (3) the officer's experience that drug transactions in this neighborhood take place on the street and involve brief meetings. This is not particularized information concerning Young's conduct and it describes large numbers of innocent persons in the neighborhood. We conclude that these factors are not sufficient to give rise to the reasonable, articulable suspicion of criminal activity that justifies the intrusion of an investigative stop.

*By the Court.*—Judgment reversed.

DYKMAN, P.J. *(dissenting)*. This case is determined by the meaning of the words "reasonable suspicion," used in a constitutional sense in *Terry v. Ohio*, 392 U.S. 1 (1968). I conclude that the information Trooper Tennessen received provided him with a reasonable suspicion that Young possessed drugs. Thus, under *Terry*, Tennessen could stop Young to investigate further. The Supreme Court justified this lesser standard by noting that a stop was a limited intrusion.

Still, saying that if a police officer "reasonably suspects" illegal activity, he or she can conduct a *Terry* stop, does not define the quantum of evidence necessary for the stop.

The Wisconsin Supreme Court has held that, for a higher burden, that of "probable cause," the evidence need not show that guilt is more likely than not. *State v. Mitchell*, 167 Wis. 2d 672, 681–82, 482 N.W.2d 364, 367–68 (1992). This is instructive, because we are told that a person may be more likely to be innocent of wrongdoing than guilty, and yet an officer can have probable cause to search or arrest that person. And "reasonable suspicion" is a lesser standard than "probable cause." *State v. Gordon*, 159 Wis. 2d 335, 348, 464 N.W.2d 91, 95 (Ct. App. 1990). All that is necessary is that the officer have more than a "hunch." *See State v. Guy*, 172 Wis. 2d 86, 95, 492 N.W.2d 311, 314 (1992).

I conclude that Trooper Tennessen had the minimal amount of evidence necessary to stop Young. Young was in an area where purchasers and sellers of drugs congregated. Drugs were sold on the street. The trooper's understanding of the term "short-term contact," which Detective Gerfen used to describe Young's actions, was a short interaction between two people which in many instances in areas of high drug-trafficking involved the purchase of drugs.

Thus, what Trooper Tennessen heard was that Young had engaged in an act in a high drug-trafficking area which, in many instances, involved a drug purchase. It need not be more likely than not that Young purchased or sold drugs. Even if it was more likely than not that Young was innocent, *Mitchell* holds that this does not defeat the existence of probable cause, a higher standard than "reasonable suspicion." I conclude that Trooper Tennessen had something more

than a hunch that Young was involved in a drug purchase. Under this standard, Tennessen was permitted to stop Young to ask him questions. He did so, and Young replied with an incriminating statement. Given the standard of "reasonable suspicion," I conclude that Young's statement need not be suppressed. Accordingly, I respectfully dissent.