STATE of Wisconsin, Plaintiff-Respondent,†

v.

Roosevelt WILLIAMS, Defendant-Appellant.

Court of Appeals

*No. 96–1821–CR.  Oral argument September 10, 1997.—Decided October 28, 1997.*

(Also reported in 570 N.W.2d 892.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Melinda Swartz,* assistant state public defender. There was oral argument by *Melinda A. Swartz.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James Doyle,* attorney general, and *Donald D. Weinstein,* assistant attorney general. There was oral argument by *Warren D. Weinstein.*

Before Wedemeyer, P.J., Schudson and Curley, JJ.

SCHUDSON, J. Roosevelt Williams appeals from the judgment of conviction, following his guilty plea, for possession with intent to deliver cocaine. He argues that the trial court erred in denying his motion to suppress evidence. He contends that, under *Alabama v. White,* 496 U.S. 325 (1990), the police failed to sufficiently corroborate information from an anonymous telephone tip and, therefore, that the police did

not have reasonable suspicion to justify stopping him. Williams is correct and, accordingly, we reverse.

The facts are undisputed. City of Milwaukee Police Officers Johnny Norred and Phillip Henschel testified at the evidentiary hearing that during the daylight hours of November 2, 1996, they received a police radio dispatch that stated:

> [Squad] 73R drug dealing complaint, 4261 North Teutonia and the alley. Somebody's dealing drugs from a blue and burgundy Ford Bronco that's parked in the driveway on the side of the building. Complaint number is 1119.

Within approximately four minutes, the officers arrived at the scene and observed a blue and burgundy Chevy Blazer with two occupants, parked at the rear of 4261 North Teutonia Avenue in the City of Milwaukee.[2] Williams was sitting in the driver's seat; a woman was sitting in the front passenger's seat. Williams had his right hand behind the passenger's seat, out of the officers' view.[3]

---

[2] Acknowledging that a Ford Bronco and a Chevy Blazer are sport utility vehicles of similar appearance, Williams does not argue that the lawfulness of the stop was undermined by the discrepancy between the vehicle make and model the radio dispatch named and the actual make and model the police observed. Nor does Williams argue that the discrepancy between the dispatch's reference to the *side* of the building and the police observation of the vehicle at the *rear* of the building reduced whatever may have been the officers' reasonable suspicion.

[3] Officer Norred also testified that the Blazer had no license plates. Neither party, however, pursued that at the evidentiary hearing. Thus, the record provides no further evidence about the car, its parked location, or whether Williams was violating any traffic laws, or any testimony that the officers believed the

The officers immediately drew their weapons and ordered Williams and the woman to get out of the Blazer.[4] The officers searched them and ordered them into the locked back seat of the squad car. The officers then conducted a "field interview" of both Williams and the woman "to find out if this was indeed the people that the caller was referring to," and "to determine . . . why they're there and . . . what they're doing." Then, while Officer Henschel remained with Williams and the woman at the squad car to do "routine" checks regarding the suspects' identities, Officer Norred searched certain areas inside the Blazer. He was concerned that Williams "may have had a gun in his hands, and he possibly may have dropped it." Officer Norred found marijuana and cocaine base inside the Blazer, and the police subsequently discovered drug paraphernalia in the back seat of the squad car where Williams and the woman had been held.

The officers testified that before making the stop, they had only the information in the radio dispatch. They did not have a license plate number of the suspect vehicle or even a "description of the suspects that were supposed to be dealing . . . [n]o age, sex, how many there were." They testified that they knew nothing of the identity or reliability of the caller whose information led to the radio dispatch. The officers also

---

absence of plates to be a violation. Thus, we disagree with the State's argument that the evidence of the absence of plates provides an alternative basis on which the trial court may be affirmed.

[4] Officer Norred testified that they "pulled them out of the vehicle," but explained that they accomplished that by "ask[ing] them to get out of the car." Officer Henschel testified that they "ordered" and "asked" Williams and the woman to exit the Blazer.

415

acknowledged that before stopping and ordering Williams and the woman out of the Blazer, they did not: (1) conduct any surveillance to see whether "there was any drug activity going on" in connection with the Blazer or its occupants; (2) conduct any surveillance to see whether "there [was] anything . . . going on around the vehicle that was consistent with drug activity"; (3) observe Williams or the woman do "anything . . . that appeared to be illegal"; or (4) observe any "furtive" gestures or "anything else" that "endangered [their] safety."

The transcript of the 911 call leading to the radio dispatch also was introduced at the evidentiary hearing:

> OPERATOR  Milwaukee Emergency Operator Number 62. How may I help you?
>
> CALLER  Yes, I'm calling . . . O.K., I don't want to get involved but there's some activity that's going in . . . going around in the back alley of my house where they're selling drugs and everything and I want to know who can I call to report so they can come around here.
>
> OPERATOR  Are they outside or is (unintelligible) . . . already . . . dealing from a house or what?
>
> CALLER  They're in the van and they giving customers, you know, drugs.
>
> OPERATOR  Do you have a description of the van?
>
> CALLER  Um, hold on, I can get for you.
>
> OPERATOR  Okay.
>
> CALLER  It's a blue and burgundy Bronco. Hello?
>
> OPERATOR  Okay. A blue and burgundy?

CALLER   Ah hah. Bronco. It's right beside, it's right beside my apartment building.

OPERATOR   Okay. Is it in the alley or is it . . . it

CALLER   It's right in the driveway. Beca . . . ah, I stay at [caller's address].

OPERATOR   Um hmm.

CALLER   And we have like this big parking lot on the side of our apartment.

OPERATOR   Okay.

CALLER   And it is right in between the . . . um . . . the parking way and the alley.

OPERATOR   So they're in the driveway?

CALLER   Right. It's a dark blue and burgundy.

OPERATOR   Okay, we'll send someone.

CALLER Okay.   Thank you.

OPERATOR   Thank you. Bye.[5]

---

[5] The State, at oral argument and in a subsequent letter to this court, directed our attention to the United States Supreme Court's recent decisions in *Ohio v. Robinette*, — U.S. —, 117 S. Ct. 417 (1996), and *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996), and argued that the subjective intent of the officers is irrelevant in determining whether reasonable suspicion existed. The State contended, therefore, that we should impute to Officers Norred and Henschel knowledge of not only the information they received in the radio dispatch, but also of all the other information they did not receive, i.e., the information contained in the informant's call. We note, however, that *Robinette* and *Whren* addressed distinct issues–"whether the Fourth Amendment requires that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary," *Robinette*, — U.S. at —, 117 S. Ct. at 419–21, and "whether the temporary detention of a motorist who the police have probable cause to believe has com-

417

The trial court concluded that "given the information within the collective knowledge of the Milwaukee Police Department, this was indeed a report of a crime in progress. The officers acted responsibly when they responded" and, further, the officers "were reasonable" in approaching the vehicle and "in ordering the two people out."[6] We conclude, however, that although the police did indeed act responsibly in responding to the dispatch, and although, of course, the police had reason to be suspicious of the Blazer and its occupants, the police did not have reasonable suspicion justifying a stop under the Fourth Amendment.

■

A trial court's legal determination of whether undisputed facts form the basis for a constitutional investigative stop is subject to *de novo* review. *See State v. Richardson*, 156 Wis. 2d 128, 137–38, 456 N.W.2d 830, 833 (1990). In *Richardson*, the Wisconsin Supreme Court reiterated the standards governing our evaluation of the police conduct:

---

mitted a civil traffic violation is inconsistent with the Fourth Amendment's prohibition against unreasonable seizures unless a reasonable officer would have been motivated to stop the car by a desire to enforce the traffic laws." *Whren*, 517 U.S. —, 116 S. Ct. at 1771–72. Neither decision addressed issues involving reasonable suspicion to stop. Nevertheless, we note that, in this case, even imputing the 911 caller's information to Officers Norred and Henschel would not save their stop.

[6] The trial court also concluded that the subsequent searches of Williams and the Blazer were lawful. Because we resolve this appeal on the basis of the initial stop, we need not address the parties' arguments and the trial court's decision on the subsequent searches. *See Gross v. Hoffman*, 227 Wis. 2d 296, 300, 277 N.W.2d 663, 665 (1938) (only dispositive issue need be addressed).

To execute a valid investigatory stop, *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] and its progeny require that a law enforcement officer reasonably suspect, in light of his or her experience, that some kind of criminal activity has taken or is taking place.[7] Such reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." These facts must be judged against an "objective standard: would the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" This test applies to the stopping of a vehicle and detention of its occupants.

The focus of an investigatory stop is on reasonableness, and the determination of reasonableness depends on the totality of circumstances:

> It is a common sense question, which strikes a balance between the interests of society in solving crime and the members of that society to be free from unreasonable

---

[7] We note that numerous published Wisconsin appellate decisions offer summaries similar to the one quoted above. In doing so, however, they fail to acknowledge a third basis justifying an investigatory stop. As codified in Wisconsin:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, *is about to commit* or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

Section 968.24, STATS. (Emphasis added.)

> intrusions. The essential question is whether the action of the law enforcement officer was reasonable under all the facts and circumstances present.

*Richardson,* 156 Wis. 2d 139–40, 456 N.W.2d at 834 (citations omitted) (footnote added). *Richardson* also concluded that the United States Supreme Court's "reasoning in *White* [was] reasonable and appropriate not only for the Fourth Amendment of the United States Constitution but also Article I, sec. 11 of the Wisconsin Constitution" and, therefore, should be applied in determining whether a police stop, based on an anonymous tip, was reasonable. *Id.* at 141–42, 456 N.W.2d at 835.

In *White*, the United States Supreme Court considered whether an anonymous informant's telephone tip, as corroborated by police observations, provided police with reasonable suspicion justifying a *Terry* stop. *White*, 496 U.S. at 326–27. The police had received an anonymous phone call stating that White would be leaving a specifically identified apartment "at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attaché case." *Id.* at 327. The police observed a brown Plymouth station wagon with a broken taillight in the parking lot in front of the apartment building, saw White leave the building carrying nothing in her hands, followed her as she drove the station wagon most of the approximate four-mile route to Dobey's Motel, stopped her, and found that she had marijuana in an attaché case and cocaine in her purse. *See id.* at 327–31.

The Supreme Court concluded that, "[a]lthough it [was] a close case," the combination of the anonymous

call and the police observations corroborating some details of the informant's tip established reasonable suspicion for the stop. *Id.* at 332. Significantly, however, the Supreme Court explained:

> [I]t is not unreasonable to conclude in this case that the independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller.
>
> We think it also important that, as in [*Illinois v.*] *Gates,* [462 U.S. 213 (1983)], "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *The fact that the officers found a car precisely matching the caller's description in front of the 235 building is an example of the former. Anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call.* What was important was the caller's ability to predict respondent's *future behavior,* because it demonstrated inside information–a special familiarity with respondent's affairs. . . . When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

*Id.* at 331–32 (fourth alteration—"[tip]," and second emphasis in original) (first emphasis added) (citations omitted).

Recently, in *State v. Young,* 212 Wis. 2d 417, 569 N.W.2d 84 (Ct. App. 1997), this court, evaluating whether police observations of a drug suspect, possibly resulting in part from a known, confidential informant's information, provided reasonable suspicion justifying a stop. We cited *United States v. Roberson,*

90 F.3d 75 (3rd Cir. 1996), *see Young*, 212 Wis. 2d at 432, 569 N.W.2d at 91–92, a case counsel for Williams also brought to our attention at oral argument. We agree that *Roberson* provides particularly helpful analysis given the close correspondence between its facts and those before us now.

In *Roberson*, the Philadelphia police had received a 911 "anonymous call stating that a heavy-set, black male wearing dark green pants, a white hooded sweatshirt, and a brown leather jacket was selling drugs on the 2100 block of Chelten Avenue. The 911 operator had no information as to the reliability of the caller or the source of this information." *Id.* at 75–76. Within less than one minute of receiving the radio dispatch containing this information, police officers observed a man matching the description walking casually over to a parked car in the 2100 block of Chelten Avenue, "a known 'hot spot' where drugs were sold to passing motorists," and lean as if to speak to the car's occupants. *Id.* at 76. Police did not, however, observe any "indicia of drug activity." *Id.*

Like the instant case, *Roberson* considered "whether an anonymous tip that contains only information readily observable at the time the tip is made may supply reasonable suspicion for a *Terry* stop in the absence of police observations of any suspicious conduct." *Id.* at 75. Applying and quoting *White*, the court concluded that the stop was not constitutional. The court explained:

> It is no doubt true that the officers were able to corroborate most of the tipster's information. But to use the [Supreme] Court's language, "Anyone could have 'predicted' " the facts contained in the tip because they were "condition[s] presumably existing at the time of the call." *Indeed, the caller*

*could have been looking out his window . . . at the time of his 911 call.*

*Id.* at 79 (citation omitted; emphasis added). Significantly, the court then declared:

> We simply cannot accept the Government's position that any resident of (or visitor to) that neighborhood who, without otherwise engendering suspicion, is unlucky enough to be the subject of a non-predictive anonymous tip, is subject to a *Terry* stop simply because the neighborhood is known for narcotics sales. Even *Alabama v. White* was referred to by the Supreme Court as a "close call." The circumstances of this case are far less compelling.
>
> Refusing to stretch *Alabama v. White* any further, we hold that the police do not have reasonable suspicion for an investigative stop when, as here, they receive a fleshless anonymous tip of drug-dealing that provides only readily observable information, and they themselves observe no suspicious behavior. To hold otherwise would work too great an intrusion on the Fourth Amendment liberties, for any citizen could be subject to police detention pursuant to an anonymous phone call describing his or her present location and appearance and representing that he or she was selling drugs. Indeed anyone of us could face significant intrusion on the say-so of an anonymous prankster, rival, or misinformed individual. This, we believe, would be unreasonable.

*Id.* at 80–81 (citation omitted).

If, as *Roberson* declared, its circumstances were "less compelling" than those of *White*, then certainly the circumstances of the instant case are "less compelling" than those of *Roberson*. After all, in the instant

case, the police had even less justification for their stop. Unlike the police in *Roberson*, they did not have any description of a suspect. Unlike the evidence in *Roberson*, no testimony suggested that the 4200 block of North Teutonia Avenue was a "hot spot" for drug dealing or other criminal activity. Unlike the suspect in *Roberson*, who approached another car, Williams remained seated in the car where the police first saw him. The court in *Roberson* commented that the police "did not" observe any "unusual or suspicious conduct." *Id.* at 80. In the instant case, the police observed even less. Thus, we conclude, consistent with *Alabama v. White*, the police stop of Williams was unconstitutional.

In reaching this conclusion, we do not require the slightest retreat from excellent police efforts to apprehend drug dealers, and we certainly do not discourage concerned citizens from aiding police with valuable tips such as the one in this case. We note, as did the court in *Roberson*, "that the police were not powerless to act on the non-predictive, anonymous tip they received. The officers could have set up surveillance of the defendant." *Id.* at 81. Indeed, particularly in cases of drug dealing,[8] excellent police work consists, in part, of surveillance leading not only to solid evidence against a suspect, but also to additional arrests of those the police observe engaging in drug transactions with the suspect. Thus, under such circumstances, the Fourth Amendment, drawing the critical line between a citi-

---

[8] Like the court in *United States v. Roberson*, 90 F.3d 75 (3rd Cir. 1996), we limit our analysis to the facts of a drug case. "We do not address whether a tip is sufficient to create reasonable suspicion when the tip involves an allegation that the defendant was carrying a gun rather than dealing drugs." *Id.* at 82 n.4.

zen's liberty and the government's intrusion, promotes police work that is truly excellent and constitutional.

*By the Court.*—Judgment reversed and cause remanded.