COURT OF APPEALS
DECISION
DATED AND FILED

April 14, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1796-CR**

Cir. Ct. No. **2018CM679**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN

PLAINTIFF-RESPONDENT

V.

LARRY ALEXANDER NORTON

DEFENDANT-APPELLANT

APPEAL from a judgment of the circuit court for Milwaukee County: KASHOUA KRISTY YANG, Judge. *Affirmed*.

¶1 BRASH, P.J.[1] Larry Alexander Norton appeals his judgment of conviction for resisting an officer. Norton contends that the trial court erred in denying his motion to suppress evidence that was seized by police during their

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2017-18). All references to the Wisconsin statutes are to the 2017-18 version unless otherwise noted.

investigation of a report of shots fired, asserting that the police did not have the requisite reasonable suspicion to stop him.

¶2    The trial court disagreed, finding that the officers had reasonable suspicion for the stop based on the nature of the call to which the police were responding, the fact that the area was considered "troublesome," and that Norton made "furtive movements" when the police approached him.  We affirm.

### BACKGROUND

¶3    In October 2017, Milwaukee police officers responded to a call of shots fired in the area of Locust Street and North Booth Street.  Two officers, who were part of the anti-gang unit and on patrol nearby, responded to the call at approximately 11:30 p.m.  The caller had reported hearing approximately eight "rapid gunfire shots" in that area.  However, there was no description of the shooter, nor did the report include information relating to a vehicle that may be involved.

¶4    When they got to that area, the officers observed a vehicle legally parked on North Booth Street.  The officers utilized their squad spotlight to see into the vehicle, and observed two people inside.  According to the officers, the man in the driver's seat—later identified as Norton—became "startled" when the spotlight illuminated the car, and "began moving as if he was … placing something, or trying to place something behind his back."

¶5    As the officers approached the vehicle, one of them observed a clear plastic baggie containing "a green, leafy plant-like substance" that he believed to be marijuana.  He then opened the vehicle door, and could smell marijuana.  Based

2

on those observations, the officers ordered Norton out of the vehicle, and he was patted down to ensure that he had no weapons.

¶6    The officers then prepared to search the vehicle. One of the officers started taking Norton to the squad car to detain him during the search. Norton pushed that officer to the ground and fled. The officers were able to catch Norton, and took him into custody. During the chase, Norton dropped another plastic baggie with a red substance that the officers suspected was ecstasy. Two additional baggies of marijuana were later found in Norton's underwear.

¶7    Norton was charged with resisting an officer and possession of THC. He filed a motion to suppress the evidence that was seized, claiming that the officers did not have reasonable suspicion to make the stop. A hearing was held on the motion in June 2018, and testimony was taken from one of the responding officers regarding their reasoning for making the stop.

¶8    The trial court denied the motion. The court found the testifying officer to be credible, and that the facts he articulated regarding his observations during the incident, taken together with the circumstances surrounding the stop—the report of shots fired in the area—were sufficient to support a finding that there was reasonable suspicion for making contact with Norton.

¶9    Subsequently, Norton entered into a plea agreement in which he pled guilty to the charge of resisting an officer. The charge of possession of THC was dismissed and read in along with an uncharged count for possession of a controlled substance—a stimulant that was in the baggie dropped by Norton when he fled from the officers. The trial court withheld sentence and placed Norton on probation for twelve months. This appeal follows.

**DISCUSSION**

¶10    In reviewing a motion to suppress, this court applies a two-step standard of review: we review the trial court's findings of fact under the clearly erroneous standard; we then review *de novo* the application of constitutional principles to those facts. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625.

¶11    As noted above, Norton's motion to suppress focused on whether there was reasonable suspicion for the stop. "The Fourth Amendment of the United States Constitution and [a]rticle I, [s]ection 11 of the Wisconsin Constitution protect people from unreasonable searches and seizures." *State v. Young*, 2006 WI 98, ¶18, 294 Wis. 2d 1, 717 N.W.2d 729 (footnotes omitted). However, the police "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

¶12    "The question of what constitutes reasonable suspicion is a common sense test:  under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience." *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997).  In making the determination of whether a police officer acted reasonably, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.  Thus, motions to suppress are decided by the trial court "'on a case-by-case basis'" by "'evaluating the totality of the

circumstances'" to determine whether an officer had reasonable suspicion for stopping and searching an individual. *State v. Johnson*, 2007 WI 32, ¶22, 299 Wis. 2d 675, 729 N.W.2d 182 (citation omitted).

¶13    The parties agree that the trial court based its finding of reasonable suspicion on three primary factors: (1) that there was a report of shots fired; (2) that the location was in a high-crime area; and (3) that Norton had made "furtive movements" when the officers directed their spotlight into the vehicle. These factual findings were based on the testimony of the responding officer, which the trial court deemed to be credible, and are thus not clearly erroneous. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530 (factual findings of the trial court that are supported by the record are generally not clearly erroneous).

¶14    Furthermore, we agree with the trial court that the totality of these circumstances constituted reasonable suspicion for making contact with Norton. The officers were investigating a report of shots fired, for which they had very little information besides the general vicinity of the incident. The responding officer who testified at the suppression hearing stated that in responding to such a call, they look for anyone "walking around with a firearm; if there is anybody that's been shot; if there's anybody fleeing from the scene. Things along [that] nature." Therefore, when they saw the parked vehicle that Norton was in, they shined their squad spotlight into it to "see if anyone had been shot inside of [the] car" or whether there was "anybody in the car that could be armed." This was a reasonable action to take based on the officers' training and experience. *See Young*, 212 Wis. 2d at 424.

5

¶15   The second factor considered by the trial court involved the fact that the officers were familiar with the area from which the shots fired report had come. The testifying officer described it as "becoming troublesome" with "a lot of drug activities" and previous reports of shots being fired in the area.

¶16   This court has previously held that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *State v. Gordon*, 2014 WI App 44, ¶15, 353 Wis. 2d 468, 846 N.W.2d 483 (citation omitted). In *Gordon*, we reversed the trial court's denial of a motion to suppress evidence that was seized from the defendant. *Id.*, ¶1. The officers had stopped Gordon because he was walking in "one of the more dangerous areas of the district" that they patrolled, and because he had done a "security adjustment"—a "conscious or unconscious movement," such as touching a pants pocket, which is sometimes done by an individual who is carrying a weapon when approached by law enforcement. *Id.*, ¶¶3-4. We noted that "sadly, many, many folks, innocent of any crime, are by circumstances forced to live in areas that are not safe," and further, that "many folks, most innocent of any nefarious purpose, may occasionally pat the outside of their clothing to ensure that they have not lost their possessions." *Id.*, ¶¶15, 17. We therefore concluded that "[p]ermitting *Terry* stops of persons momentarily patting the outside of their clothing when the *only* additional facts are that those persons are in a high crime area and have seen a cruising police car would expand the individualized reasonable suspicion requirement so far so as to negate it." *Id.*, ¶18 (internal quotation marks omitted).

¶17   However, in this case, Norton's presence in that area was not "standing alone"—it was accompanied by the information that there had been shots fired in the area, which the officers here were investigating. *See id.*, ¶15.

Furthermore, when they illuminated the vehicle with their squad spotlight, they saw Norton make "furtive movements"—the third factor considered by the trial court—which caused the officers to become concerned that he may have been trying to conceal a firearm, due to the nature of the call they were investigating.

¶18    Norton argues that our supreme court was critical of relying on "furtive movement" to support a finding of reasonable suspicion in *Johnson*. *See id.*, 299 Wis. 2d 675, ¶¶3, 43. In that case, police officers had pulled over a vehicle that they knew had an emissions violation. *Id.*, ¶2. As they stopped the vehicle, the officers observed the driver—Johnson—lean forward, appearing to reach under the seat. *Id.*, ¶3. Johnson provided documentation that the emissions violation had been corrected; however, the officers nevertheless had him step out of the vehicle, and proceeded to pat him down and search his vehicle due to his "furtive movement" when they had stopped him. *Id.*, ¶¶3-7.

¶19    The supreme court held that the officers lacked reasonable suspicion for the pat-down and search, stating that the emissions violation for which he was pulled over was "in no way linked to criminal activity or weapons possession." *Id.*, ¶40. Moreover, when Johnson provided the satisfactory documentation, the only remaining reason for the search was his alleged "furtive movement[.]" *Id.*, ¶3, 40. The court noted that there are any number of "innocuous movements persons make in their vehicles every day," such as reaching for a purse or wallet, reaching for registration in the glove compartment, putting down a soda, or turning off the radio. *Id.*, ¶43.

¶20    Again, the present case is distinguishable. Here we have officers investigating a report of shots fired, which by definition is "linked to … weapons possession," and often to "criminal activity" as well. *See id.*, ¶40. Furthermore,

7

the testifying officer explained that Norton's movement was suspicious because normally someone confronted with a bright spotlight would put a hand up to block the light, as opposed to reaching behind his or her back. This is a "specific reasonable inference[]" which the officer was "entitled to draw from the facts in light of his experience." *See Terry*, 392 U.S. at 27.

¶21 "Officers need to see a person's hands so that they can determine whether the individual is reaching for a weapon." *State v. Kyles*, 2004 WI 15, ¶41, 269 Wis. 2d 1, 675 N.W.2d 449. In considering Norton's movements, particularly when taken together with the type of call to which the officers here were responding, they thought Norton could be a threat. *See Terry*, 392 U.S. at 27. This further supports a finding of reasonable suspicion for making contact with Norton.

¶22 In sum, the decisions of *Terry* and its progeny have "recognized the legitimacy of an investigative stop as effectively meeting government interests in crime prevention and protection," as long as officers had a reasonable suspicion to do so. *State v. Richardson*, 156 Wis. 2d 128, 138-39, 456 N.W.2d 830 (1990). In this case, the totality of the circumstances support the trial court's finding that the officers had reasonable suspicion to stop and investigate Norton. *See Young*, 212 Wis. 2d at 424. We therefore affirm his judgment of conviction.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)(4).

8