COURT OF APPEALS
DECISION
DATED AND FILED

April 28, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP435-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2016CF3891**

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

   V.

JAMES TIMOTHY GENOUS,

      DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: DENNIS R. CIMPL, Judge. *Reversed.*

Before Brash, P.J., Dugan and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. James Timothy Genous appeals a judgment of conviction, following a guilty plea, to one count of being a felon in possession of a firearm. Genous contends that the evidence against him was obtained as a result of an unconstitutional traffic stop and that the trial court erred in denying his motion to suppress that evidence. Because we conclude that there was no reasonable suspicion to stop Genous, we conclude that the trial court should have granted Genous's motion to suppress. Accordingly, we reverse the judgment of conviction.

## BACKGROUND

¶2     On September 1, 2016, Genous was charged with one count of being a felon in possession of a firearm. According to the criminal complaint, West Allis Police Officer Adam Stikl initiated a traffic stop on August 28, 2016, at 3:36 a.m., after noticing a vehicle parked outside of a house known to be occupied by a heroin user. The complaint states that the driver of the vehicle, subsequently identified as Genous, "appeared to make a transaction[.]" Police Officer Bernie Molthen also responded to the stop and observed a black handgun under the driver's seat. Genous was subsequently arrested and charged.

¶3     Genous filed a motion to suppress the evidence, arguing that the evidence was obtained as a result of an illegal seizure. Specifically, Genous argued that there was no reasonable suspicion to stop his car. Genous argued that West Allis police stopped him based on a brief interaction with a woman suspected to be a drug user, but did not witness an exchange of any sort.[1]

---

[1] Genous's motion also argued that West Allis police exceeded the permissible scope of the stop by ordering Genous out of the car and by ordering him to remove his shoes and socks. The motion further alleged that police lacked probable cause to search Genous's vehicle by opening the car door. Because we conclude that police lacked reasonable suspicion to stop Genous's car, we need not address Genous's subsequent arguments.

¶4 At a hearing on the motion, Stikl testified that on August 28, 2016, he was on patrol in an unmarked squad car when he noticed a legally parked black sedan in front of a residence that was running and had its headlights on. Stikl stated that he turned the headlights of the squad car off and drove about a half a block closer to the parked vehicle. Shortly thereafter, Stikl noticed that the driver of the sedan—Genous—turned off the headlights of his vehicle. A few seconds later a female came out of a house, entered the front passenger side of the sedan, and remained in the vehicle for about fifteen to twenty seconds. She then exited the sedan and returned to the home. Stikl testified that he believed the woman to be a known drug user, K.S., who had multiple interactions with the West Allis police. Stikl's belief was based on a West Allis Police Department email describing K.S., stating that she lived at that particular address and was a known drug user. The email instructed officers not to work with K.S., as she was known to continue using drugs. The email also provided a physical description of K.S., which Stikl stated matched his observation of the woman. Stikl stated that he assumed the parties were engaged in a drug transaction because, based on his "training and experience," "a lot of … dealers … meet their clients at their residence or a different location and then drive back to their … home." Stikl also stated that because Genous's sedan was parked in front of the home of a known drug user in a high drug trafficking area, the parties engaged in a brief interaction inside of the sedan, and the female matched the description of a known drug user, he was concerned that a drug transaction was underway. Stikl radioed for backup, informing other officers of his observations and notifying them that he was going to conduct a traffic stop.

¶5 Stikl further testified that after the woman—later confirmed to be K.S.—returned to her home, Genous began to drive away, at which point Stikl began to follow him. Prior to stopping the sedan, Stikl ran the vehicle's license plate and

discovered that it was registered to a person who lived in the City of Milwaukee. Stikl stated that he had no information about a black sedan being used to transport drugs to that area, nor was Stikl aware of a black sedan belonging to a known drug dealer or drug user.

¶6 Stikl further testified that when he initiated the traffic stop, Genous pulled over right away. After Stikl made contact with Genous, he told Stikl that he went to meet his mistress; however, she failed to show up. When Stikl told him that he had seen a female enter his car, Genous acknowledged that a woman with K.S.'s first name had, in fact, entered his vehicle. He explained that the woman wanted money from him, but left when Genous did not give it to her.

¶7 Stikl stated that when he was speaking with Genous, he observed multiple cell phones, hand sanitizer, and cigar wrappers in the vehicle. Stikl stated that "[i]t's common knowledge drugs dealers actually conceal narcotics within their anal area. And what they do is they use the hand sanitizer after removing that stuff to clean their hands." He also noted that cigar wrappers can be used to smoke marijuana by rolling the marijuana in the wrapper, which is called a "blunt."

¶8 Stikl testified that Officer Molthen and another officer arrived on the scene. Stikl stated that one of the officers notified him that Genous made "furtive movements" by "using his hands to go underneath the seat," prompting one of the officers to ask Genous to exit his vehicle. Stikl told Genous to sit on a curb and ordered Genous to remove his shoes and socks. Molthen then told Stikl that he noticed a gun in plain view inside the vehicle. Stikl testified that no drugs were found either in the vehicle or on Genous's person. Stikl further stated that Genous was cooperative. Stikl admitted that he did not know how many people actually resided at the residence at issue, nor had he seen a picture of K.S. Stikl stated that

he relied primarily on the address and the physical description contained in the police department email.

¶9 Molthen testified that when he arrived as backup, he noticed Genous "dipping his right shoulder down like he was reaching for something underneath his seat or trying to place something underneath the seat." Molthen stated that he alerted the other officers, Genous was removed from the vehicle, and then Molthen peered into the vehicle and saw the handle of a firearm sticking out from under the driver's seat.

¶10 The trial court denied Genous's motion, finding that under the totality of the circumstances, the officers had reasonable suspicion to stop Genous. Specifically, the court noted that: (1) Genous was in a high drug trafficking area; (2) there was short-term contact between Genous and a known drug user; (3) the time was 3:30 a.m.; and (4) Genous's vehicle was "suspiciously running with its lights on and then turns its lights off and turns the car off," when K.S. ran out of the house, into the vehicle, and then back into the house.

¶11 Genous subsequently pled guilty to being a felon in possession of a firearm. The trial court sentenced him to one year of initial confinement and one year of extended supervision.

**DISCUSSION**

¶12 When reviewing a trial court's ruling on a suppression motion, we will uphold its factual findings unless they are clearly erroneous. *See State v. Roberts*, 196 Wis. 2d 445, 452, 538 N.W.2d 825 (Ct. App. 1995). However, whether a stop meets constitutional and statutory standards is a question of law, which we review *de novo. See State v. Krier*, 165 Wis. 2d 673, 676, 478 N.W.2d 63 (Ct. App. 1991).

¶13     The Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution protect an individual's right to be free from unreasonable searches and seizures. *State v. Young*, 2006 WI 98, ¶18, 294 Wis. 2d 1, 717 N.W.2d 729. However, police may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The Fourth Amendment's protections require that police have more than an "inchoate and unparticularized suspicion or 'hunch[.]'" *Terry*, 392 U.S. at 27. "[W]hat constitutes reasonable suspicion is a common sense test: under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience." *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997).

¶14     The State asserts that under the totality of the circumstances, the investigatory stop was reasonable. Genous contends that the police lacked reasonable suspicion to believe that he was engaged in a drug transaction or any other criminal activity. Genous argues that none of the facts relied upon by Stikl, either individually or cumulatively, were sufficient to constitute a reasonable suspicion that criminal activity was afoot. We agree.

¶15     In reviewing the record, it is clear that West Allis police placed heavy emphasis on Genous's brief interaction with K.S., as well as the location of the interaction, as the basis for the investigatory stop. We addressed a similar factual situation in *Young*, 212 Wis. 2d 417. In that case, we held that a person's presence in a high drug trafficking area, together with information conveyed from one police officer to another that the defendant had had a "short-term contact" with another individual, were not sufficient to constitute reasonable suspicion of criminal activity

justifying an investigative stop, despite the officer's experience that drug transactions in that neighborhood often took place on the street during brief meetings. *See id.* at 429-30. We noted those factors did not constitute "particularized information concerning Young's conduct and ... describe[d] large numbers of innocent persons in the neighborhood." *See id.* at 433. We held that without more, an individual's presence in a known drug trafficking area, an officer's observation of a brief meeting between the individual and another man on the street, and the officer's experience that drug deals often occur in brief on-street meetings, did not create a reasonable suspicion to justify an investigatory stop. *See id.*

¶16 Here, we are similarly unable to discern the required reasonable suspicion necessary to justify the investigative stop at issue. Stikl testified that Genous's short interaction with a known drug user (K.S.), outside of that known drug user's home, within a high drug trafficking neighborhood, led him to believe that a drug transaction was taking place. None of these facts, either individually or in totality, give rise to reasonable suspicion. At the time of the stop, Stikl was dependent upon a police department email containing a physical description of K.S. Stikl had neither seen a picture of K.S., nor was he aware of whether K.S. was the only resident of that home. Stikl did not see what occurred when K.S. was inside of Genous's vehicle. He did not see an exchange of money or goods, he did not see K.S. enter the car with anything in her hands, and he did not see K.S. emerge from the car holding anything. Stikl simply saw a woman enter Genous's vehicle, remain in there for about fifteen to twenty seconds, exit the vehicle, and go back into her house. Applying the principles we articulated in ***Young***, we conclude that Genous's brief encounter with K.S. does not support a reasonable inference that the woman entered Genous's vehicle for the purpose of buying or selling illegal drugs.

¶17    The fact that Genous's encounter with K.S. took place early in the morning in a known drug trafficking neighborhood does not give rise to reasonable suspicion. Stikl testified that drug transactions do not only occur at certain hours, and we have previously rejected the notion that drug transactions are more likely to occur in the middle of the night. *See State v. Betow*, 226 Wis. 2d 90, 96, 593 N.W.2d 499 (Ct. App. 1999) (noting that case law discussing reasonable suspicion does not stand for "the proposition that drugs are more likely to be present in a car at night than at any other time of day"). Moreover, the fact that Genous was sitting in a running vehicle and turned the headlights off is inconsequential to our analysis. In short, we conclude that Stikl stopped Genous based on a "hunch."

¶18    Because we conclude that police lacked the requisite reasonable suspicion to conduct the investigatory stop at issue, we need not address Genous's arguments regarding whether the officers exceeded the permissible scope of the stop, and whether the officers lacked probable cause to open Genous's car door. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (stating that an appellate court should decide cases on the narrowest possible grounds).

¶19    For the foregoing reasons, we reverse the judgment of conviction.

*By the Court.*—Judgment reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).