STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Roosevelt WILLIAMS, Defendant-Appellant.

Supreme Court

*No. 96–1821–CR. Oral argument November 12, 1998.—Decided April 27, 1999.*

(Also reported in 591 N.W.2d 823.)

For the plaintiff-respondent-petitioner the cause was argued by *Warren D. Weinstein,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Melinda Swartz,* assistant state public defender.

¶ 1. DONALD W. STEINMETZ, J. The State seeks review of a court of appeals' decision reversing the judgment of conviction of the defendant Roosevelt Williams. Two issues are presented in this case:

¶ 2. The first issue is whether police officers had reasonable suspicion to conduct an investigatory stop of Roosevelt Williams when, responding to an anonymous tip that unidentified individuals were dealing drugs from a vehicle parked within view of the tipster, they confirmed the readily observable information offered by the tipster without independently observing any suspicious activity. The Milwaukee County Circuit Court, Judge James Eaton presiding, answered "yes."

The court of appeals answered "no," holding that an anonymous tip containing only readily observable information failed to constitute reasonable suspicion in the absence of independent police observations of suspicious activity.

¶ 3. The second issue is whether a protective frisk of the vehicle following the stop was illegal because police officers lacked reasonable suspicion that the defendant might have been armed and dangerous. The circuit court again answered "no." The court of appeals did not reach this issue.

¶ 4. We find that under the circumstances of this case that the police officers did have reasonable suspicion to conduct an investigatory stop of the defendant. We also find that the officers' protective frisk of the defendant and the vehicle was not unreasonable. We reverse the court of appeals and affirm the decision of the circuit court and uphold the judgment of conviction.

I

¶ 5. The defendant Roosevelt Williams was stopped on November 2, 1995 as he sat with one other person in a vehicle parked in an area adjoining an apartment building at 4261 North Teutonia in Milwaukee. Police Officers Johnny Norred and Phillip Henschel, responding to a dispatch relaying a report of drug activity at that address, approached Williams from the front of the vehicle in which Williams was sitting. As they approached, with their weapons drawn, the officers ordered both occupants from the vehicle. The officers made an initial pat-down of both, found nothing, and then placed both in the back seat of their police car. Officer Norred returned to the stopped vehicle and searched the areas which were within the reach of the two occupants for weapons. He found no

weapons, but did discover both marijuana and cocaine. Williams was subsequently arrested and charged with knowingly possessing with intent to deliver five grams or less of cocaine, a controlled substance, contrary to Wis. Stat. §§ 161.16(2)(b)1 and 161.41(1m)(cm)1.

¶ 6. On November 10, 1995, the defendant moved to suppress the evidence seized by the officers as a result of their search on the grounds that they did not have a warrant and that the circumstances leading to the search provided them with no exception to the search warrant requirement.

¶ 7. On January 10, 1995, the circuit court held an evidentiary hearing on the defendant's motion. The parties stipulated to the reception into evidence of a transcript of a November 2, 1996, 9–1–1 telephone call received from an anonymous caller. The transcript is repeated here:

OPERATOR: Milwaukee Emergency Operator Number 62. How may I help you?

CALLER: Yes, I'm calling. . .O.K., I don't want to get involved but there's some activity that's going in. . .going around in the back alley of my house where they're selling drugs and everything and I want to know who can I call to report so they can come around here.

OPERATOR: Are they outside or is (unintelligible). . .already. . .dealing from a house or what?

CALLER: They're in the van and they giving customers, you know, drugs.

OPERATOR: Do you have a description of the van?

CALLER: Um, hold on, I can get for you.

OPERATOR: Okay.

CALLER: It's a blue and burgundy Bronco. Hello?

OPERATOR: Okay. A blue and burgundy?

CALLER: Ah hah. Bronco. It's right beside, it's right beside my apartment building.

OPERATOR: Okay. Is it in the alley or is it. . .it

CALLER: It's right in the driveway. Beca. . .ah, I stay at 4261 North Teutonia.

OPERATOR: Um hmm.

CALLER: And we have like this big parking lot on the side of our apartment.

OPERATOR: Okay.

CALLER: And it is right in between the. . .um. . .the parking way and the alley.

OPERATOR: So they're in the driveway?

CALLER: Right. It's a dark blue and burgundy.

OPERATOR: Okay, we'll send someone.

CALLER: Okay. Thank you.

OPERATOR: Thank you. Bye.

---

¶ 8. The officers, in the squad car 73R, did not receive the above transcript, but instead responded to the following radio dispatch:

OPERATOR: Disrestrict [sic] until further notice.

OPERATOR2: 73R.

SQUAD 73R: 73R.

OPERATOR2: 73R drug dealing complaint, 4261 North Teutonia and the alley. Somebody's dealing drugs from a blue and burgundy Ford

Bronco that's parked in the driveway on the side of the building. Complaint number is 1119.

SQUAD 73R:   10–4.

---

¶ 9.   Officer Norred testified that after receiving the radio dispatch, approximately four minutes passed before he and Officer Henschel arrived in their marked squad car at 4261 North Teutonia. On their initial pass of the location they observed a vehicle closely matching, although not identical, to the description of the vehicle provided by their dispatcher.[1]

¶ 10.   The officers next drove around the block in order to approach the vehicle from the vehicle's front. At that point, the officers observed that the vehicle was a two-door blue and burgundy Chevy Blazer without license plates. Officer Norred admitted that he and his partner neither conducted surveillance nor observed any drug activity.

¶ 11.   The officers then left their squad car and approached the Blazer. Officer Norred observed that the defendant's right hand was behind the passenger seat, and he testified that the defendant's hand was already in place when the officer first noticed the defendant's position; that is, Norred did not see the defendant make any moves which could be characterized as furtive. Although he did not see a weapon, he testified that he was concerned for his safety. Therefore, he and his partner approached the Blazer with their weapons drawn.

---

[1] Instead of finding a Ford Bronco, as the anonymous caller and the dispatcher had indicated, the officers observed a Chevy Blazer. Officer Norred testified that the vehicles are similar in appearance.

¶ 12. The officers asked the occupants to exit the vehicle, at which point the officers patted them down. They found no weapons or contraband. The officers then placed both individuals into the back seat of their squad car.

¶ 13. While Officer Henschel remained in the squad car with the two individuals, Officer Norred returned to the Blazer and searched the area behind the driver's seat where he earlier had noticed the defendant's hand to have been hidden from his view. Norred testified that the purpose of this search was his safety. He stated that the defendant "may have had a gun in his hands, and he possibly may have dropped it [behind the seat]." On cross-examination Norred explained he needed to search the area behind the seat, for his "life depends on it when I have a call like this—drug dealers have been known to carry guns—and my life is on the line. I don't know if he has a weapon there or not, and I certainly would—felt there was a possibility of danger to myself."

¶ 14. During this protective search of the vehicle, Officer Norred discovered a ball of a green leafy substance which he suspected was marijuana. He also found a small container with 26 rocks of a white-rock like substance which he suspected was cocaine base, and another small bag of marijuana next to the passenger seat. It was at this point that he placed the defendant under arrest.

¶ 15. At the conclusion of this evidentiary hearing, the circuit court denied the defendant's motion to suppress. The court specifically found that the police officers verified the readily observable information contained in the anonymous call and that the defendant's hand was behind the passenger seat as the officers approached the vehicle. The court ruled that together,

the two facts sufficiently supported the officers' reasonable suspicion for making a stop, and that together, the two facts also made reasonable the officers' protective search of the occupants and the Blazer.

¶ 16. The defendant pled guilty to the charge in the information. The court found the defendant guilty and ordered a judgment of conviction, and later sentenced him to 30 months in the state prison system.[2] The defendant appealed the order denying his motion to suppress.

¶ 17. The court of appeals reversed the circuit court, holding that the information contained in the 9–1–1 anonymous call and independently corroborated by the police officers did not reach the requisite level of reasonable suspicion necessary for a stop. *State v. Williams*, 214 Wis. 2d 412, 570 N.W.2d 892 (Ct. App. 1997). The court held that reasonable suspicion under the circumstances in this case requires not only that the police corroborate anonymous tips with independent observation of the details of such calls, but that they must also either corroborate the predictions contained in those tips, *see Alabama v. White*, 496 U.S. 325 (1990), or make independent observations of suspicious activities. *Williams*, 214 Wis. 2d at 422–424 (citing *United States v. Roberson*, 90 F.3d 75 (3d Cir. 1996)). We disagree with the court of appeals and now reverse.

---

[2] Reserve Judge James Eaton presided over the evidentiary hearing on the defendant's motion to suppress and the defendant's plea hearing; he also entered a judgment of conviction; Judge Maxine A. White presided over the defendant's sentencing hearing.

## II

¶ 18. In reviewing a circuit court order suppressing or denying the suppression of evidence, this court will uphold a circuit court's findings of fact unless they are against the great weight and clear preponderance of the evidence. *See State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990). However, whether the circuit court's findings of fact pass statutory or constitutional muster is a question of law that this court reviews de novo. *Id.*

¶ 19. The threshold issue is whether Officers Norred and Henschel had reasonable suspicion to conduct an investigatory stop of Williams. In executing a valid investigatory stop of an individual, a law enforcement officer need only reasonably suspect, in light of his or her experience, that some kind of criminal activity has taken or is taking place. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The constitutional standard established in *Terry* was codified by the Wisconsin legislature in Wis. Stat. § 968.24,[3] and in interpreting the scope of the statute, this court must review the facts leading to an investigatory stop in light of *Terry* and its progeny. *State v. Waldner*, 206 Wis. 2d 51, 55, 556 N.W.2d 681 (1996).

---

[3] Wis. Stat. § 968.24 provides as follows:

**Temporary questioning without arrest.** After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such a person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

¶ 20. In determining what facts are sufficient to authorize police to stop a person, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Only with a view toward the totality of the circumstances are we able to determine the reasonableness of an officer's actions. Our consideration of the reasonableness of an officer's actions has us ask

> a common sense question, which strikes a balance between the interests of society in solving crime and the members of that society to be free from unreasonable intrusions. The essential question is whether the action of the law enforcement officer was reasonable under all the facts and circumstances present.

*Richardson*, 156 Wis. 2d at 139–40.

¶ 21. Further, reasonable suspicion

> is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' [citation omitted], that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*White*, 496 U.S. at 330.

¶ 22. In the instant case, the anonymous tip reporting drug dealing activity is one of the facts that forms the whole picture the officers had developed in making an investigatory stop of Williams. We must determine what weight, if any, the police could give to

that tip in deciding to make their stop—it is a determination that assesses the quality of that information.

¶ 23. In *White*, the United States Supreme Court for the first time considered the weight police could accord an anonymous tip when making an investigatory stop. Specifically, the Court confronted the question of whether police officers had the requisite reasonable suspicion to stop a vehicle when the entirety of their suspicion was based upon their corroboration of innocent activities detailed in an anonymous tip.

¶ 24. Police were first informed of allegedly criminal activity when they received an anonymous tip that the defendant in *White* would be leaving her apartment at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she was driving to a particular motel, and that she would be in possession of about an ounce of cocaine carried inside a brown attach case. Following their receipt of the call, officers proceeded to the defendant's apartment building where they identified the Plymouth station wagon as that described in the call. Subsequently, they saw a female get into the vehicle and then drive in the most direct course toward the motel indicated by the anonymous caller. Before the defendant reached the motel, the officers stopped her. They asked her to step out of her car and to step to its rear, and then explained that she was suspected of carrying cocaine in the vehicle. She granted the officers permission to search her vehicle, and when they did so, they discovered an attach case, within which they discovered marijuana. She was then placed under arrest. The defendant moved to suppress the evidence on grounds that the initial stop of her car was not premised upon

the officers' reasonable suspicion that a crime had been or was about to be committed.

¶ 25. The Supreme Court disagreed with the defendant. After acknowledging that the police observed no suspicious activity, and that they confirmed only some of the innocent details included in the anonymous tip, the Court held that the information, as corroborated by independent police work, nevertheless "exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *White*, 496 U.S. at 327.

¶ 26. Prior to engaging in an analysis of the facts in *White*, the Court noted that in most circumstances, an anonymous tip like the one in *White*, without more, would not " ' "warrant a man of reasonable caution in the belief" that [a stop] was appropriate.' " *Id.* at 329 (quoting *Terry*, 392 U.S. at 22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925))). This was so, the Court reasoned, because an anonymous tip like the one in *White* would generally fail due to the lack of evidence regarding a tipster's "veracity," "reliability," and "basis of knowledge," all of which are critical factors in making an investigatory stop. *White*, 496 U.S. at 328–29. Where these critical factors are absent, the quality of the information within the tip is seriously undermined and therefore may not sufficiently provide reasonable suspicion in the absence of additional facts.

¶ 27. However, the Court found that the tip in *White*, which contained predictions of the defendant's future activity, did contain these critical factors. It held that a prediction of even innocent activities, contained in an anonymous tip and verified by the police, is of sufficient quality that an officer can rely solely on the tip as his or her basis for the reasonable suspicion needed to make an investigatory stop. The Court rea-

soned that "because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity." *Id.* at 331 (citing *Illinois v. Gates*, 462 U.S. 213, 244 (1983)). "Thus, it is not unreasonable to conclude in [*White*] that the independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller." *Id.* at 331–332.

¶ 28.  The Court in *White* drew a distinction between allegations of future behavior and facts and conditions that exist at the time of a tip. Because the former are not easily predicted, stated the Court, the anonymous tip in *White* was reliable because the prediction demonstrated the caller's "inside information—a special familiarity with [defendant's] affairs." *White*, 496 U.S. at 332.

> Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to have access to reliable information about that individual's illegal activities. [citation omitted] When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

*Id.* at 332.

■

¶ 29.  In *Richardson,* we recognized the "special emphasis" the Court placed on the police verification of the caller's predictions. *Richardson,* 156 Wis. 2d at 142. We then stated our agreement with the Court in *White*

that the verification of significant aspects of an anonymous tip "serves to avoid investigative stops based on minimal facts that any passerby or resident on the street could enunciate." *Id.*

¶ 30.   The anonymous caller in the instant case provided the police with no information that could be characterized as a prediction of Williams' future behavior. All the parties agree that with respect to the anonymous tip, the police officers did no more here than verify information readily observable to the tipster. The defendant argues that because the Court in *White* drew a distinction between predictions of future behavior and readily observable information that existed at the time of the tip, the failure of the police to verify a prediction here renders the entire tip worthless for purposes of establishing reasonable suspicion. This conclusion might also be reached under a liberal reading of *Richardson* which placed special significance on the verification of non-readily observable information. We disagree that *White* and *Richardson* are to preclude officer reliance on all anonymous tips except for those which include predictions.

¶ 31.   The absence of information predicting the future behavior of an individual who is the subject of an anonymous tip does not necessarily make worthless that anonymous tip. Despite the significance the *White* Court places in the anonymous caller's ability to predict future activities, we do not read the decision to require that a tip contain a prediction in order to ensure an anonymous caller's "veracity," "reliability," or "basis of knowledge." That is, *White* established that the verification of an anonymous caller's prediction is a sufficient, not a necessary, element establishing reasonable suspicion. In accordance with this view, the requirement in *Richardson* that non-readily observa-

173

ble significant aspects of an anonymous tip must be verified by police before they have reasonable suspicion to make a *Terry* stop is a requirement that necessarily applies only to tips which do contain predictions.

¶ 32. We agree with a number of courts that "[t]he Court in [*White*] did not depart from its well-established 'totality of the circumstances' test; nor did it adopt a categorical rule requiring the corroboration of predictive information as a precondition to reliance on anonymous tips." *United States v. Clipper*, 973 F.2d 944, 949 (D.C. Cir., 1992); *see also United States v. Bold*, 19 F.3d 99, 104 (2nd Cir. 1994) ("There is nothing in *White* that precludes police from acting on an anonymous tip when the information to be corroborated refers to present rather than future actions."); *United States v. Gibson*, 64 F.3d 617, 623 (11th Cir. 1995)(finding "that *White* does not prevent law enforcement officers from relying and acting on anonymous tips when the information to be corroborated does not refer to future actions but instead details present circumstances.").

¶ 33. In the limited circumstance where an anonymous tip provides the police with information concerning ongoing criminal activity that a tipster is observing at the time he or she makes the call, the critical factors of "veracity," "reliability," and "basis of knowledge" may be established in a manner no less certain than they are when a tip contains a prediction of an individual's future activity. A comparison of the emergency call detailing ongoing criminal activity in the present case with the anonymous tip containing predictions of an individual's future behavior in *White* demonstrates that the two contain information equally rich in quality.

174

¶ 34. A tipster's "basis of knowledge" can be determined by answering the following question: how does the tipster know the information that he or she is relaying? In *White*, the Court arrived at the answer to this question through the inference that the tipster must be well-informed about the defendant's criminal activity because he accurately predicted the defendant's innocent activity. *See White*, 496 U.S. at 332. Under the circumstances presented to this court, the anonymous tipster's "basis of knowledge" is even more certain than that in *White*, for here the caller explicitly tells the 9–1–1 operator his or her basis of knowledge—the caller's contemporaneous observation of criminal activity taking place outside his or her apartment. When the officers corroborated the innocent details of the caller's observation, it was reasonable for them to believe that the tipster was positioned to observe the reported criminal activity as well.

¶ 35. With respect to the "reliability" of the information in *White*, the Court found that police corroboration of the information detailing innocent activity gave rise to the inference that the call contained information reliable with respect to the criminal activity as well. As strong an inference can be made in the instant case. Here, as in *White*, the officers' corroboration of the readily observable information supports a finding that because the tipster was correct about the details of those innocent activities, he or she is probably correct about the ultimate fact of criminal activity. For purposes of reliability, both the tip in *White* and the tip here contained the same type of information—innocent activities that police corroborated and the ultimate fact of criminal activity that could be inferred reliable due to the accuracy of innocent activities.

175

¶ 36. A tipster's "veracity" appears to be the key concern in assessing an anonymous tip. The Court in *White* established the tipster's veracity upon its conclusion that the caller had a basis of knowledge and was reliable, observing that because the anonymous caller was able to predict future events accurately, "there was reason to believe. . .that the caller was honest." *Id.* at 332. Under the circumstances of the instant case, an anonymous caller's use of an emergency telephone system to report a current and ongoing crime provides as sufficient a reason to believe that the caller is honest as the reason found in *White*. Neither the tip in *White*, nor the one found here, contains direct evidence of the tipster's honesty. In both, the tipster's honesty must be inferred from the circumstances.

¶ 37. The Court in *White* appears to conclude that one who knows another well, knows another intimately enough to know his or her daily activities, could be trusted not to be a prankster. It is a point that was highlighted by the court in *Roberson*, the case relied upon heavily by the court of appeals. *Roberson* was concerned that an individual reporting an ongoing crime, like the caller in this case, could be an "anonymous prankster, rival, or misinformed individual." *Roberson*, 90 F.3d at 81. While it is true that the anonymity of a caller is a concern, we believe that there is no more likelihood that a completely anonymous person will play the prankster than the individual who knows the subject of his or her tip quite well.

¶ 38. Furthermore, the test of a citizen-informant's reliability is less strict than the test applicable to the police-informant.

When faced with information received from a citizen informant, Wisconsin holds that the test for reliability shifts-from a question of personal reliability to 'observational' reliability. A citizen informant's reliability must be evaluated from the nature of his report, his opportunity to hear and see the matter reported, and the extent to which it can be verified by an independent investigation.

*State v. Boggess*, 110 Wis. 2d 309, 316, 328 N.W.2d 878 (Ct. App. 1982) (citing *State v. Doyle*, 96 Wis. 2d 272, 287, 291 N.W.2d 545, 552 (1980)). We have quoted with approval that "[a] *citizen who purports* to be a victim of *or to have witnessed a crime is a reliable informant even though his reliability has not theretofore been proved or tested." Doyle*, 96 Wis. 2d at 287 (quoting *State v. Knudson*, 51 Wis. 2d 270, 276, 187 N.W.2d 321 (1971)(quoting *People v. Bevins*, 85 Cal. Rptr. 876 (1970) (emphasis in the original)).

¶ 39.    We find that an anonymous tip that is, as here, supplied by a citizen informant, lacking in predictions but describing a crime in progress, can be accorded some weight in an officer's consideration of reasonable suspicion. A bar on information garnered from an anonymous tip which failed to predict future activity that could be independently corroborated by the police would bar some of the most helpful and reliable information: that which comes from citizens observing crime in their own neighborhoods. These are individuals who are honest, reliable, and base their knowledge of criminal activity on their observation of that activity. They may also be, as was evident from the call here, individuals who for a variety of reasons may not want to identify themselves.

¶ 40.    The transcript of the anonymous call in the instant case supports a finding that this caller was

177

reliable, honest, and an eyewitness to the criminal activity. The caller initially misidentified the vehicle as a van—then, when asked to describe the vehicle in greater detail, stated that the vehicle was a Ford Bronco. In fact, the vehicle was a Chevy Blazer. This minor mistake strengthens the reliability of the caller's observations, for the mistakes suggest that the observation is taking place at the time of the call and is not rehearsed. Further evidence that the call is not rehearsed but is in fact taking place contemporaneous with the observed criminal activity is the caller's need to leave the telephone for brief periods in order to further observe the activity when the 9–1–1 operator asked the caller specific questions.[4]

¶ 41. Further, in assessing whether the officers had the requisite reasonable suspicion, we must consider not only the tip, but also the circumstances in which the tip was received, and with that in mind balance the privacy interest of Williams against the need to protect society. Where the public is placed at a substantial risk—the classic example is that of the report that an armed person has been seen walking the streets—the balance may favor protection of the public over the privacy rights of the individual.

¶ 42. For instance, in *Clipper*, the District of Columbia Circuit Court held that where an anonymous tip informs police that an individual is carrying a weapon, police officers have the requisite reasonable suspicion to stop and perform a frisk where the "anonymous informant makes no predictions, but provides the

---

[4] While the officers did not receive any evidence of the caller's reliability, the evidence of that reliability, held by the authorities, may be imputed to them. *See State v. Cheers*, 102 Wis. 2d 367, 388–89, 306 N.W.2d 676 (1981)(quoting *Schaffer v. State*, 75 Wis. 2d 673, 676–77, 250 N.W.2d 326 (1977)).

police with verifiable facts while alerting them to an imminent danger that the police cannot ignore except at risk to their personal or the public's safety." *Clipper*, 973 F.2d at 949–950. And in *Bold*, the second circuit held that "[w]here the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for a prompt investigation." *Bold*, 19 F.3d at 104.

¶ 43. Courts have observed the competing interests involved: An officer "who is able to corroborate other information in an anonymous tip that another person is in actual possession of a gun is faced with an 'unappealing choice.'" *Id.* (citing *United States v. McClinnhan*, 660 F.2d 500, 502 (D.C. Cir. 1981). "He must either stop and search the individual, or wait until the individual brandishes or uses the gun." *Id.* Under such circumstances, officers may constitutionally make that investigatory stop.

¶ 44. This unappealing choice police face is not limited to cases which involve gun-tips. In *State v. Stuart*, 452 S.E.2d 886 (W. Va. 1994), the West Virginia Supreme Court concluded that police had sufficient reasonable suspicion to stop a vehicle that matched the description of the vehicle reported by an anonymous caller and detailing evidence of drunk driving, even though the police did not independently corroborate either behavior that appeared suspicious *or* any predicted activity. In *Stuart*, in addition to the information contained in the tip which could only be characterized as that which is readily observable, the police observed nothing else except for the innocent activity of the vehicle being driven ten miles per hour below the speed limit; this observation, in connection with the readily

179

observable information contained in the anonymous call, was sufficient to provide reasonable suspicion to stop that vehicle.

¶ 45. The defendant would distinguish the instant case from one involving a tip informing police of a weapons violation or of a vehicle that appears to be controlled by an intoxicated driver, on the grounds that the latter cases involve situations in which the public is potentially placed in danger. The defendant further notes that the court in *Clipper*, and the court of appeals in this case, also draw a distinction between the danger posed by a subject reported to have a gun and a subject reported to be engaged in drug dealing. The distinction is one of degree only. Drug dealing is a dangerous activity, and we have previously recognized that where drugs are involved, guns are probably involved as well. *See Richardson*, 156 Wis. 2d at 144. It is unreasonable to conclude that drug dealing poses no danger to the community—it is not a non-violent crime—and when deciding whether to make a stop, the possible danger the subject of a tip poses to the community is necessarily one of an officer's considerations.

¶ 46. Finally, while the issue presented to this court was whether an anonymous tip, by itself, could establish probable cause to arrest, the issue, and the court of appeals' decision, too narrowly presents the scope of the question. In considering the totality of the circumstances known to the officers prior to their stop of the defendant, all of the facts known to the officers at the time of the stop must be considered.

¶ 47. In our review of the circumstances here, taking into consideration both the quality and quantity of the information, and then balancing the individual's right to privacy against the need to protect the public,

we find that the police had the requisite reasonable suspicion to conduct an investigatory stop of Williams.

¶ 48.   First, the police corroborated the following readily observable information from the call reporting a crime in progress: that the vehicle they observed largely matched the description of the vehicle as offered by the anonymous caller. As described, the vehicle was at the location stated. Two people were in the vehicle, a fact also in accord with the language used by the caller (although the caller did not identify the number of individuals involved, his or her use of the plural demonstrates that he or she was observing more than one person). That the caller was correct about all of the readily observable information increased the likelihood that he or she was also correct that the defendant was engaged in drug dealing.

¶ 49.   Second, the police arrived at the scene described by the caller within four minutes or so of the call. The timing of their response ensured that the reported information was still fresh, increasing the likelihood that the officers would confront the possible drug dealers while decreasing the likelihood that they would mistakenly detain the wrong suspects. *See Gibson*, 64 F.3d at 623.

¶ 50.   Third, the officers were not limited to the innocent and readily observable information provided by the caller. In addition to the information contained in the tip, the police also noted that the vehicle did not have license plates,[5] and, when approaching the vehicle, the defendant's hand was not in view. While the

[5] The absence of license plates on the vehicle may or may not be an innocent activity, as the record does not disclose whether the vehicle was engaged at the time of the encounter, or whether it was on a public thoroughfare. We note that the absence of license plates by itself may have been sufficient to

defendant's hand did not disappear from view in a furtive manner, the placement of the hand behind the seat could only heighten the officers' suspicion that drug activity was taking place.

¶ 51. The absence of license plates on the vehicle, as well as the defendant's hand being hidden from view, might be considered innocent activities under any number of scenarios. However, we stated in *Richardson* that

> the corroboration by police of innocent details of an anonymous tip may under the totality of the circumstances give rise to reasonable suspicion to make a stop. The corroborated actions of the suspect, as viewed by police acting on an anonymous tip, need not be inherently suspicious or criminal in and of themselves. Rather, the cumulative detail, along with reasonable inferences and deductions which a reasonable officer could glean therefrom, is sufficient to supply the reasonable suspicion that crime is afoot and to justify the stop.

*Richardson*, 156 Wis. 2d at 142. These two innocent activities, coupled with the information the police had when they were responding to a drug dealing report, would reasonably contribute to the officers' suspicions and their conclusion that a stop for the limited purpose of investigation was warranted.

■

¶ 52. The officers had the following facts and information before them: an anonymous 9–1–1 phone call from a citizen informant detailing information concerning his or her contemporaneous observation of illegal drug dealing activity; independent corrobora-

---

justify the stop. *See State v. Griffin*, 183 Wis. 2d 327, 515 N.W.2d 535 (Ct. App. 1994).

tion of the readily observable information from that anonymous tip; the quick response time in which they arrived at the reported scene; their observation that the vehicle contained no license plates; and their inability to observe the defendant's hand. Considering the totality of these circumstances, the officers had the requisite reasonable suspicion to "stop" the defendant.

### III

■

¶ 53.   Next, we must determine whether the officers were justified in searching the defendant and the vehicle in which the defendant was sitting for weapons following the stop. The Court in *Terry* enunciated the test for determining the constitutionality of a frisk for weapons during an investigatory stop. The Court wrote that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. An officer must have a reasonable suspicion—less than probable cause, but more than a hunch—that someone is armed before frisking that person for weapons. *State v. Guy*, 172 Wis. 2d 86, 95, 492 N.W.2d 311 (1992). An officer's right to make a protective search for weapons includes a search of a passenger compartment of an automobile during an investigatory stop. *Michigan v. Long*, 463 U.S. 1032 (1983); *State v. Moretto*, 144 Wis. 2d 171, 423 N.W.2d 841 (1988).

¶ 54.   Neither party suggests that the reasonable suspicion required for a protective search of the individual requires a different calculus than that required for a protective search of the vehicle. The circuit court believed Officer Norred's testimony that following the

defendant's detainment under the *Terry* stop, he would have been released back to the Blazer. Therefore, if the officers were reasonable to believe that the defendant could have been armed, they were reasonable to believe that the vehicle contained a weapon that could harm them as well, and they were then entitled to search the passenger area of the vehicle to ensure their safety. As the Supreme Court explained in *Long* and we quoted with approval in *Moretto*,

> If a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested.
>
> . . .
>
> Just as a *Terry* stop on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. . . .In any event, we stress that a *Terry* investigation. . .involves a police investigation 'at close range,' when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger. . . .'

*Moretto*, 144 Wis. 2d at 180 (quoting *Long*, 463 U.S. at 1050–52).[6]

---

[6] The United States Supreme Court's holding in *Long* was reaffirmed in *Knowles v. Iowa,* — U.S. —, 119 S.Ct. 484 (1998), a case decided subsequent to the oral arguments in the instant case. The Court in *Knowles* held that police officers may not conduct a search of a vehicle incident to a traffic citation accom-

¶ 55. The State argues that the officers' search of the defendant was reasonable because they were responding to a drug dealing complaint, and it is common knowledge that drug trafficking and weapons go hand-in-hand. Both officers testified at the suppression hearing that as they approached the vehicle in response to the report of drug activity, they were concerned about their safety. We find that under the circumstances a "reasonably prudent officer in [officers Norred's and Henschel's] position would be justified in believing [their] safety was in danger." *Guy*, 172 Wis. 2d at 96.

> One of the reasons this belief would be reasonable is that weapons are often 'tools of the trade' for drug dealers. *See, e.g., United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977). This court has recognized that '[t]he violence associated with drug trafficking today places law enforcement officers in extreme danger.' *State v. Williams*, 168 Wis. 2d 970, 984, 485 N.W.2d 42 (1992); *see also State v. Richardson*, 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990) ('Several cases have found that drug dealers and weapons go hand in hand, thus warranting a *Terry* frisk for weapons.')

panying a routine traffic stop. *Id.* at —, 119 S.Ct. at 488. The Court wouldn't countenance a "search incident to citation" exception to the warrant requirement because in a routine traffic stop and citation, officers are generally not in danger for their safety, and they have no need to preserve evidence. However, the Court continues to recognize that where officers have an independent basis to search for weapons and protect themselves from danger, they may "conduct a 'Terry patdown' of the passenger compartment of a vehicle upon reasonable suspicion that an occupant is dangerous and may gain immediate control of a weapon." *Id.* (citing *Long*, 463 U.S. at 1049).

*Id.* Given the level of violence associated with drug trafficking, the officers could reasonably believe that their safety was jeopardized, providing sufficient justification for performing a *Terry* frisk of both the individual and the vehicle for the limited purpose of their protection.

¶ 56. The defendant's objection to this conclusion is that the protective search of the vehicle was illegal because Officer Norred did not possess the reasonable suspicion that he was armed. In the defendant's view, an officer's belief that a drug deal is taking place is insufficient to support a frisk for weapons. He finds support for his position in the decision of the Supreme Court in *Richards v. Wisconsin*, 520 U.S. 385 (1997), that "while drug investigation frequently does pose special risks to officer safety. . .not every drug investigation will pose these risks to a substantial degree." *Id.* at 393.

¶ 57. In concluding that Wisconsin could not have a blanket exception to the knock and announce rule based upon the inherent dangers associated with drug dealing, the Court in *Richards* reasoned that not all drug searches pose special risks to law enforcement officers. However, the examples the Court provided as support for this holding are significantly different than the situation now before us—as when a search was conducted "at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence." *Id. Richards* is not applicable under the facts of this case, for our finding that the police had the requisite reasonable suspicion to conduct a patdown of the defendant is not premised upon a blanket rule allowing officers to do so.

¶ 58. There are doubtless circumstances in which a frisk under *Terry* would not be justified following a *Terry* stop that is based upon a report of drug dealing. This case, however, is not one of those circumstances. Here, the officers first approached Williams suspecting him of drug dealing. As they did so, Williams' hand was hidden from the officers' view. When frisked himself, Williams did not have any weapons on his person. Under these circumstances it was not unreasonable for Officer Norred to suspect, as he did, that Williams may have had a weapon and dropped it on the floor of the Blazer before he exited the vehicle. These circumstances justified Officer Norred's limited search of the vehicle for they lead a reasonably prudent individual to the conclusion that his or her safety is in danger.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 59. DAVID T. PROSSER, J. (*concurring*). This case has been argued and analyzed as a case involving an investigatory stop. In this context, the principal question is whether officers Johnny Norred and Phillip Henschel had reasonable suspicion for an investigatory stop while the defendant and another person were sitting in the front seat of an automobile parked behind an apartment building at 4261 North Teutonia Avenue in Milwaukee. While I join in the mandate and opinion of the court, I write this concurrence to help explain my belief that the two officers were on very solid footing when they acted as they did.

## TOTALITY OF THE CIRCUMSTANCES

¶ 60. The court is obliged to take into account the totality of the circumstances in determining whether the police had sufficient evidence to warrant an investigatory stop. *Illinois v. Gates*, 462 U.S. 213, 230–33 (1983); *State v. Richardson*, 156 Wis. 2d 128, 456 N.W.2d 830 (1990). The totality of the circumstances includes the direct observations of the two officers, the collective information in the police agency, and the experience of the officers in evaluating the information available.

¶ 61. The knowledge of the two officers is combined in determining the existence of either reasonable suspicion or probable cause. Moreover, the information possessed by the entire police department is imputed to these officers under long-standing Wisconsin law. In *State v. Mabra*, 61 Wis. 2d 613, 625–26, 213 N.W.2d 545 (1974), the court, speaking through Chief Justice Hallows, stated:

> Mabra contends the arresting officer must personally have in his mind knowledge sufficient to establish probable cause for the arrest. This is an incorrect view of the law. The arresting officer may rely on all the collective information in the police department. . . .The police force is considered as a unit and where there is police-channel communication to the arresting officer and he acts in good faith thereon, the arrest is based on probable cause when such facts exist within the police department. *Whiteley v. Warden* (1971), 401 U.S. 560, 91 Sup. Ct. 1031, 28 L. Ed. 2d 306.

¶ 62. These principles were repeated in *Desjarlais v. State*, 73 Wis. 2d 480, 491–92, 243 N.W.2d 453 (1976) (citing *State v. Taylor*, 60 Wis. 2d 506, 515,

210 N.W.2d 873 (1973)), and *State v. Shears,* 68 Wis. 2d 217, 253, 229 N.W.2d 103 (1975). "[W]here an arresting officer is given information through police channels such as roll call, this court's assessment of whether the arrest was supported by probable cause is to be made on the collective knowledge of the police force." *State v. Cheers,* 102 Wis. 2d 367, 388, 306 N.W.2d 676 (1981) (citing *Schaffer v. State,* 75 Wis. 2d 673, 676–77, 250 N.W.2d 326 (1977), *overruled on other grounds, State v. Walker,* 154 Wis. 2d 158, 453 N.W.2d 127 (1990)).

¶ 63.   The collective knowledge rule is not a parochial Wisconsin invention. It is prevalent throughout the United States. For instance, the Minnesota Supreme Court said: "The test in Minnesota under the 'collective knowledge' approach, is whether the pooled knowledge of the entire police department is sufficient to establish probable cause." *State v. Eling,* 355 N.W.2d 286, 290 (Minn. 1984) (citing *State v. Conaway,* 319 N.W.2d 35, 40 (Minn. 1982)).[1]

## 911 CALLER

¶ 64.   Against this background, the person who called 911, saying that drugs were being sold from a vehicle parked behind her apartment building at 4261 North Teutonia Avenue, should not be viewed as an anonymous tipster. The police knew the caller's identity or could easily have discovered it because of the information provided by 911.

¶ 65.   Today, the 911 emergency telephone number is familiar to most people in Wisconsin. According to a 1997 audit by the Legislative Audit Bureau, "As of

---

[1] *See also United States v. Green,* 962 F.2d 938, 942 (9th Cir. 1992); *Charles v. Smith,* 894 F.2d 718, 724 (5th Cir. 1990), *cert. denied* 498 U.S. 957 (1990); *United States v. Hoyos,* 892 F.2d 1387, 1392 (9th Cir. 1989), *cert. denied* 498 U.S. 825 (1990).

May 1997, an estimated 94 percent of the State's popu-
lation was receiving 9–1–1 service from one of 121
answering points being operated in the 57 counties
that provide 9–1–1 service." *A Best Practices Review:
911 Services*, State of Wisconsin Legislative Audit
Bureau (July 1997), at 3. The audit indicated that 105
of the 121 answering points operate an "enhanced
9–1–1 system," which automatically identifies and dis-
plays the caller's telephone number and location. *Id.* at
4.

¶ 66.   There is a statutory framework for the
"statewide emergency services number." *See* Wis. Stat.
§ 146.70. Subsection (1)(i) of the statute defines
"sophisticated system" as "a basic system with auto-
matic location identification and automatic number
identification." A "sophisticated system" and the
"enhanced 9–1–1 system" referred to in the audit are
essentially the same thing.

¶ 67.   An "enhanced" system normally provides
authorities with (1) the name of the residence or place
of business where the incoming call is made, (2) the
address of the residence or place of business where the
incoming call is made, and (3) the telephone number of
the phone from which the incoming call is made.[2]

¶ 68.   The 1997 audit states that Milwaukee has
had an enhanced system since 1989. *A Best Practices
Review: 911 Services, supra*, Appendix III at 2. This is
confirmed by news reports from Milwaukee newspa-
pers. "By nearly 8 to 1, voters said in a referendum that
they wanted [Milwaukee] County to establish a 911

---

[2] At present, a cellular phone call will *not* provide this infor-
mation, so that when a cellular call is received, the dispatcher
must ask the caller for identification if it is not volunteered. *A
Best Practices Review: 911 Services*, State of Wisconsin Legisla-
tive Audit Bureau (July 1997), at 7.

system, which automatically records a caller's telephone number and address at a central dispatch location, even if the caller cannot speak." *911 System Wins Big in County Referendum*, MILWAUKEE JOURNAL, November 5, 1986, at 3B.

¶ 69. In a later article, Leverett F. Baldwin, then emergency government services director of Milwaukee County, now Milwaukee County Sheriff, is quoted as saying that the 911 system was expected to eliminate most prank calls because the caller's telephone number and address will be recorded and will be easy to track down. Ralph D. Olive, *Single Number May Call for Help*, MILWAUKEE JOURNAL, January 18, 1988, at 3B.

¶ 70. In fact, the legislature established criminal penalties for any person who intentionally dials the telephone number "911" to report an emergency, "knowing that the fact situation which he or she reports does not exist. . . ." Wis. Stat. § 146.70(10). This penalty provision long predated the 911 call in this case.

¶ 71. Florida has a similar penalty. In *United States v. Gibson*, 64 F.3d 617, 625 (11th Cir. 1995), the court observed that, "The state of Florida provides a significant deterrent against reporting false information to its law enforcement agencies and officers by making such acts punishable by law. FLA. STAT. ANN. § 365.171(16) (West 1995) (false "911" calls); *Id.* § 817.49 (false reports of commission of crimes to law enforcement officers). *This deterrent increases the odds that an anonymous tip is legitimate.*" (Emphasis added.)

¶ 72. When the police received the 911 call in this case, they knew at a minimum the address and phone number of the caller, and the call was recorded. The dispatcher never asked for the caller's name, address,

or telephone number; rather, the dispatcher replied "Um hmm" when the caller disclosed that, "I stay at 4261 North Teutonia." In giving her address, the caller confirmed what the dispatcher already knew.

¶ 73. The dispatcher did ask whether the caller had a description of the van, and the caller replied: "Um, hold on, I can get for you." Then the caller returned and gave a more detailed description of the vehicle. The color of the vehicle, the location of the vehicle, and the fact that more than one person was in the vehicle were either described or alluded to by the caller and later confirmed by the officers. In addition, the caller answered all other questions asked by the dispatcher.

¶ 74. The recorded call and its subsequent transcript show both the caller's basis of information and the caller's reliability. But the fact that the agency either knew the identity of the caller or had the means to discover the caller's identity puts the call in a different light. The caller politely asked for police intervention in alleged criminal activity she was witnessing. In effect, the caller was saying: "Come quickly. As you know, I am at my apartment, and I am watching criminal activity out my back window." Were this information false, the police would have been able to follow up and confront the caller, demand an explanation, and perhaps press criminal charges.

¶ 75. In my view, then, this case does not involve an anonymous tipster or an anonymous caller. The essence of anonymity is being unknown. Anonymity and confidentiality are cousins, not twins. A confidential informant is an informant whose identity is assiduously withheld. An anonymous informant is an informant whose identity is unknown. The identity of the caller in this case was not unknown. It has been

kept confidential out of respect to a citizen who came forward to report what she saw.

## LOCATION OF THE VEHICLE

¶ 76. When the officers arrived at the scene, they were able to see the blue and burgundy vehicle from "quite a distance." The Chevy Blazer was parked in an alley or in a parking lot adjacent to an alley behind a building on Teutonia. The building is located on the west side of Teutonia. An "empty lot-type deal" is located near the building.

¶ 77. Strategically, the subject vehicle was not parked on a street where it could be easily observed. It was parked in or near an alley, behind a building, where it was partially concealed from traffic on Teutonia.

¶ 78. In its decision, the court of appeals declared that:

> We note, as did the court in *Roberson*, "that the police were not powerless to act on the non-predictive, anonymous tip they received. The officers could have set up surveillance of the defendant." Indeed, particularly in cases of drug dealing, excellent police work consists, in part, of surveillance leading not only to solid evidence against a suspect, but also to additional arrests of those the police observe engaging in drug transactions with the suspect.

*State v. Williams*, 214 Wis. 2d 412, 424, 570 N.W.2d 892 (Ct. App. 1997).

¶ 79. This advice presupposes that the situation permitted surveillance. The record does not provide evidence that a marked squad car could have stopped to watch the vehicle without itself being seen. We know

that this case is different from *U.S. v. Roberson*, 90 F.3d 75 (3d Cir. 1996), because in *Roberson* the criminal activity was out on the street, not in an alley. We also know that the officers here circled around the block trying to approach the vehicle without being seen.

¶ 80.   The officers first saw the Blazer at "quite a distance." Had the occupants seen the squad car at "quite a distance," they could have started the car and attempted to drive away. Then the officers would have faced a decision whether to stop a moving vehicle. *Cf. State v. Harris*, 206 Wis. 2d 243, 557 N.W.2d 245 (1996).

## ABSENCE OF LICENSE PLATES

¶ 81.   Officers Norred and Henschel drove north on Teutonia Avenue past the building and then turned west on Roosevelt Drive. Eventually, they entered the alley at a point where they thought their squad car would be concealed. They drove through the alley, coming up to the front of the Chevy Blazer. There were no license plates on the car.

¶ 82.   Like 29 other states and the District of Columbia, Wisconsin requires two license plates on a car.[3] For the last 20 years, there have been efforts in the Wisconsin legislature to move from two license plates to one license plate. But, according to the Legislative Fiscal Bureau, "the major objection to the single license plate proposal has been expressed by law enforcement officials. They contend that the front

---

[3] *See* Wis. Stat. §§ 341.12(1) and 341.15(1). *See also The Fast Track to Vehicle Services Facts, A Motor Vehicle Regulations and Procedures Information Guide* (1999 ed.), American Association of Motor Vehicle Administrators, at 83.

license plate has value because it allows identification of oncoming and parked vehicles."[4]

¶ 83. In this case, there were no plates on the Blazer. Under the circumstances, the primary concern of the police officers would have been identifying the vehicle, not ticketing the driver for a motor vehicle violation. From the point of view of the officers, the suspected drug vehicle had been stripped of the standard means of identifying it. The absence of license plates added to the evidence which permitted the officers reasonably to conclude in light of their training and experience that criminal activity might be afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

¶ 84. In *State v. Griffin*, 183 Wis. 2d 327, 329, 515 N.W.2d 535 (Ct. App. 1994), *review denied*, 520 N.W.2d 88 (1994), *cert. denied*, 513 U.S. 950 (1994), the court of appeals held that the absence of license plates, and reasonable inferences that can be drawn from that fact, provide reasonable suspicion sufficient to justify an investigatory stop of a motor vehicle. The absence of license plates in this case, as evidenced by the record, combined with the court of appeals' holding in *Griffin*, provides further support that the officers had reasonable suspicion to make an investigatory stop.

---

[4] Cheryl McIlquham, Issue Paper #864, 1997–99 Budget, Single License Plate, Legislative Fiscal Bureau (May 22, 1997), at 2.

In a May 24, 1995, letter to the Legislative Joint Committee on Finance, Emil S. Thomas, Deputy Chief of Police, Madison Police Department, stated, "Police Officers utilize license plates for the basic purpose of identification. . .Requiring a front plate significantly improves the chance of an officer identifying a suspect leaving the scene of a crime as the officer responds to the scene. It also enhances the odds of a citizen witness correctly identifying the plate number."

¶ 85. Reasonable suspicion is a smaller quantum of evidence than probable cause because the temporary seizure of a person in an investigatory stop is less than the complete and lasting seizure of a person in an arrest. In my view, the two officers had more than reasonable suspicion to make an investigatory stop. Consequently, I concur in the mandate and opinion of the court.

¶ 86. WILLIAM A. BABLITCH, J. (*dissenting*). The majority opinion allows any report called in to 911 to trigger a police stop and frisk if the anonymous caller describes a vehicle, tells how many people are in it, where it is parked, and then alleges the unnamed occupants are selling drugs. The potential for mischief-making directed to totally innocent people is patent. Neither the quantity nor the quality of the facts relied upon by the police create a reasonable suspicion to conduct an investigatory stop under the Fourth Amendment in this case. Accordingly, I respectfully dissent.

¶ 87. The facts are few and can be listed briefly. On November 2, 1995, an anonymous 911-caller alleged that drugs were being sold from a blue and burgundy vehicle in the driveway at the side of an apartment building at a Milwaukee address. Officers were quickly dispatched to the address. The officers corroborated the three lone facts supplied by the 911-caller: 1) there was a vehicle matching the color and general model in caller's description, 2) at the location provided by the caller, and 3) two people were in the vehicle, comporting with the caller's use of the plural "they're selling drugs." The officers contemporaneously observed that the vehicle did not have a front license

plate, and the defendant's right hand was behind the passenger seat. Guns drawn, the two officers approached the vehicle to conduct an investigatory stop.

¶ 88. With these facts in mind, our task is to objectively assess the reasonableness of the decision by the officers to conduct an investigatory or *Terry*[1] stop. A professional law enforcement officer may find reasonable suspicion from objective facts that appear ordinary to the untrained. *United States v. Cortez*, 449 U.S. 411, 419 (1981). But I conclude the facts alone are in too short of supply to form a legitimate basis for an investigatory stop in this case. The record shows only bits and fragments of information.

¶ 89. The first fragment of information is supplied by an anonymous informant to a 911-operator. Certain anonymous tips describing only innocent details of identification can be factored into a reasonable suspicion determination if it can be found that the tip is reliable. *State v. Richardson*, 156 Wis. 2d 128, 142–43, 456 N.W.2d 830 (1990); *Alabama v. White*, 496 U.S. 325 (1990). As explained in *Richardson*, "the greater the amount, specificity and uniqueness of the detail contained in an anonymous tip, the more likely it is that the informant has an adequate basis of knowledge." *Richardson*, 156 Wis. 2d at 142. The anonymous callers in *Richardson* and *White*, however, provided far greater detail than the caller in this case. In *White*, the caller told police the name of the suspect, a specific address where she could be found at a specific time, the details of her vehicle down to its broken taillight and a detailed description of her future itinerary. Even with

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

these details *White* was characterized as a "close case" by the Supreme Court. *White,* 496 U.S. at 332.

¶ 90. In comparison to *White* and *Richardson,* the tipster here provided little. The anonymous caller did not provide a name or physical description of the occupants. The caller did not state any details with respect to the purchase of drugs. The caller did not state how long the suspects had been parked in the lot. The caller did not allege that the defendant was armed. The caller did not allege any facts that indicated that violence was in the offing. The anonymous caller did not provide any information other than a general description of a vehicle, its location, and that it was occupied by one or more individuals. I agree with Chief Judge Posner, who said:

> to deem the tip adequately corroborated by circumstances that, as in this case, show nothing more than that the tipster had seen the person he was reporting would be mere bootstrapping, for the tipster could easily be a prankster who seeing a perfectly innocent-looking person in the street calls up the police and describes the location and appearance of the person. It is different if the details that are given by the tipster and that the police corroborate before making the stop are details that only. someone personally acquainted with the suspect would know. There is still a chance that the tip is a lie—the tipster may be a personal enemy of the person he is reporting—but the probability is sufficiently low to permit the police to stop the person reported on the basis of the tip.

*United States v. DeBerry,* 76 F.3d 884, 886 (7th Cir. 1996) (internal citations omitted).

¶ 91. Corroboration of the spare details provided by the anonymous caller in the instant case is mere

bootstrapping and adds no weight to the "reasonable suspicion" calculation. This type of tip may be a useful lead for police surveillance and further investigation but to justify a "stop and frisk," additional facts must be established. *White*, 496 U.S. at 329 (for Fourth Amendment purposes, tips " 'completely lacking in indicia of reliability. . .require further investigation before a forcible stop of a suspect would be authorized . . .' ") (citation omitted). The police investigation of the tip must provide additional information to justify moving from being merely suspicious of the vehicle and its occupants to having reasonable suspicion justifying a *Terry* stop.

¶ 92.   Turning then to the actions by the officers at the location, the officers did indeed corroborate the descriptive observations provided by the 911-caller. The officers saw more than one person sitting in the described vehicle at the described location. The officers could not know whether these were in fact the same people the caller claimed to have seen engaging in criminal activity because the caller did not provide any physical description whatsoever of the alleged drug dealers.

¶ 93.   The majority opinion resolves this problem by stating that the officers arrived promptly at the scene while the information from the caller was still fresh, decreasing the likelihood of detaining the wrong suspect. However the anonymous 911-tipster did not provide any time frame of when the illegal activity was observed, or any descriptive facts which would show whether the caller actually saw illegal drugs being sold, other activity which a trained law enforcement officer would associate with illegal activity, or merely suspected criminal activity.

¶ 94. Next, the officers observed that the driver, Williams, had his right hand behind the passenger seat. The officers did not see Williams make any sort of a "furtive" gesture. The officers observed no sudden, guilty or threatening moves. Additionally, the officers did not see any weapon and the anonymous caller did not allege any weapon to be present or in use. In total, the record presents no facts from which I can infer circumstances placing the public in immediate and substantial risk of danger and requiring swift action by the officers.

¶ 95. The facts do not suggest that time was of the essence. Nevertheless, the officers did not conduct any surveillance to see whether there was any drug activity going on in connection with the vehicle or its occupants; they did not observe Williams or the other passenger do anything that appeared to be illegal; nor did they observe anything else that endangered public safety or the safety of the officers. Thus, the observations by the officers at the scene did not add any facts to "establish the requisite quantum of suspicion than would be required if the tip were more reliable." *White*, 496 U.S. at 330.

¶ 96. A greater quantity of even innocent facts could have supported reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1 (1989). In *Sokolow*, the Supreme Court found reasonable suspicion when federal agents knew the defendant paid over $2000 cash for two airline tickets from a roll of $20 bills containing nearly twice that amount of cash; traveled under a name that did not match the name under which his telephone number was listed; had traveled on a round-trip flight from Honolulu to Miami, a source city for illicit drugs; stayed in Miami for only 48 hours, even though a round-trip ticket from Honolulu to Miami

200

takes 20 hours; appeared nervous; and checked none of his luggage. *Sokolow*, 490 U.S. at 3–4, 6. The court held that the total impact of this quantity of facts supported the agent's conclusion that criminal action was afoot and an investigatory stop was warranted. In the present case the quantity of facts in the record simply falls far short of the required mark.

¶ 97. Moreover, while an allegation of drug dealing is a most serious matter, the majority opinion links the allegation to violent criminal action by observing that where drugs are involved, guns are probably involved as well. *See Richards v. Wisconsin*, 520 U.S. 385, 393 (1997) ("[W]hile drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree.") The officers in this case, however, did not observe anything resembling drug dealing nor did they observe any weapons, nor did the tipster report weapons or gunfire. It was daytime when the officers responded to the call.

¶ 98. Finally, I agree with the court of appeals' conclusion that although the police testified that the Williams vehicle had no front license plate, neither party pursued the issue at the evidentiary hearing and therefore the record on this issue is insufficient to serve as an alternative basis on which the circuit court may be affirmed. *State v. Williams*, 214 Wis. 2d 412, 414 n.3, 570 N.W.2d 892 (Ct. App. 1997).

¶ 99. These facts are insufficient to support a stop and frisk. I respectfully dissent.

¶ 100. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON and JUSTICE ANN WALSH BRADLEY join this dissent.